Charles M. Coate, Esq. (SBN: 140404)
Theresa E. Johnson, Esq. (SBN: 254123)
COSTA ABRAMS & COATE LLP
1221 Second Street, Third Floor
Santa Monica, California  90401
Tel: (310) 576-6161
Fax: (310) 576-6160
Email: ccoate@cacllp.com
Email: tjohnson@cacllp.com
Attorneys for Plaintiff Shame On You Productions, Inc.

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA -- WESTERN DIVISION

| | |
|---|---|
| SHAME ON YOU PRODUCTIONS, INC., a California corporation,<br><br>                    Plaintiff,<br><br>          vs.<br><br>ELIZABETH BANKS, an individual; MAX HANDELMAN, an individual; STEVEN BRILL, an individual; BRILLCO, INC., a California corporation; FOCUS WORLD, INC., a California corporation; SIDNEY KIMMEL ENTERTAINMENT, LLC, a California limited liability company; FILMDISTRICT PICTURES, LLC, a Delaware limited liability company; LAKESHORE ENTERTAINMENT CORP., a Delaware corporation; LAKESHORE ENTERTAINMENT GROUP LLC, a California limited liability company; and Does 1 – 10, inclusive,<br><br>                    Defendants. | Case No.:<br><br>**COMPLAINT FOR DAMAGES AND INJUNCTION FOR:**<br><br>**1. COPYRIGHT INFRINGEMENT**<br>**2. BREACH OF IMPLIED-IN-FACT CONTRACT**<br><br>**DEMAND FOR JURY TRIAL** |

## JURISDICTION AND VENUE

1.     This is an action for copyright infringement arising under the Copyright Act of 1976, 17 U.S.C. §§ 101 et seq. This Court has jurisdiction of this action under 28 U.S.C. §§ 1331, 1338(a) and 1338(b), and under its supplemental jurisdiction.

2.     Venue is proper in this district under 28 U.S.C. §§ 1391 and 1400(a) as a substantial part of the events or omissions giving rise to the claim occurred, and the defendants and/or their agents reside or may be found, in this judicial district.

## PARTIES

3.     Plaintiff SHAME ON YOU PRODUCTIONS, INC. (hereinafter referred to as "SOYP" or "PLAINTIFF") is a California corporation with its principal place of business located in Los Angeles, California.  The President of SOYP is Dan Rosen ("ROSEN"), who created an original motion picture screenplay entitled "Darci's Walk of Shame" (the "Screenplay"). ROSEN is an established writer, director and producer in the entertainment industry best known for writing "The Last Supper" starring Cameron Diaz, directing the film "The Curve," and more recently co-writing and directing the film "Freeloaders," among other credits.  PLAINTIFF is the contractual assignee and owner of all and exclusive rights including all rights under contract and copyright, and to any and all claims possessed by ROSEN, with respect to the Screenplay and all drafts and versions of it.

4.     PLAINTIFF is informed and believes, and on that basis alleges, that Defendant ELIZABETH BANKS (hereinafter referred to as "BANKS" or "DEFENDANT") is an individual, residing in Los Angeles County, California. PLAINTIFF is further informed and believes, and on that basis alleges, that BANKS is a producer and an actress with numerous film and television credits,

and according to the Internet Movie Database ("IMDB") stars in a motion picture entitled "Walk of Shame" (the "Film") released theatrically, digitally, and on pay per view on May 2, 2014.

5.     PLAINTIFF is informed and believes, and on that basis alleges, that Defendant MAX HANDELMAN (hereinafter referred to as "HANDELMAN" or "DEFENDANT") is an individual residing in Los Angeles County, California. PLAINTIFF is further informed and believes that HANDELMAN is married to BANKS, and that together they produce films through their company, Brownstone Productions.

6.     PLAINTIFF is informed and believes, and on that basis alleges, that Defendant STEVEN BRILL (hereinafter referred to as "BRILL" or "DEFENDANT") is an individual residing in Los Angeles County, California. PLAINTIFF is further informed and believes, and on that basis alleges, that BRILL is a director, writer, and actor with numerous film credits, and according to IMDB is the Director and the credited Writer for the Film.

7.     PLAINTIFF is informed and believes, and on that basis alleges, that Defendant BRILLCO, INC. (hereinafter referred to as "BRILLCO" or "DEFENDANT") is a corporation existing under the laws of California maintaining its principal place of business at 2029 Century Park E., Ste. 1500, Los Angeles, California 90067.  PLAINTIFF is further informed and believes, and on that basis alleges, that BRILLCO is a loanout corporation created for BRILL's directing, writing, and/or acting services.

8.     PLAINTIFF is informed and believes, and on that basis alleges, that Defendant FOCUS WORLD, INC. (hereinafter referred to as "FOCUS WORLD" or "DEFENDANT") is a corporation existing under the laws of California maintaining its principal place of business at 5929 Sunrise Mall, Citrus Heights, California 95610.  PLAINTIFF is informed and believes, and on that basis alleges,

that FOCUS WORLD is qualified to do business and is doing business in the State of California, County of Los Angeles. PLAINTIFF is further informed and believes, and on that basis alleges, that FOCUS WORLD is a film distributor with numerous film credits, and according to IMDB is one of the Distributors for the Film.

9.     PLAINTIFF is informed and believes, and on that basis alleges, that Defendant SIDNEY KIMMEL ENTERTAINMENT, LLC (hereinafter referred to as "SKE" or "DEFENDANT") is a limited liability company existing under the laws of California maintaining its principal place of business at 9460 Wilshire Blvd., Ste. 500, Beverly Hills, CA 90212.  PLAINTIFF is informed and believes, and on that basis alleges, that SKE is qualified to do business and is doing business in the State of California, County of Los Angeles. PLAINTIFF is also informed and believes, and on that basis alleges, that SKE is a film production company with numerous film credits, and according to IMDB is one of the Production Companies producing the Film.

10.     PLAINTIFF is informed and believes, and on that basis alleges, that Defendant FILMDISTRICT PICTURES, LLC (hereinafter referred to as "FDP" or "DEFENDANT") is a limited liability company existing under the laws of Delaware maintaining its principal place of business at 1540 Second St., Ste. 200, Santa Monica, CA 90401.  PLAINTIFF is informed and believes, and on that basis alleges, that FDP is qualified to do business and is doing business in the State of California, County of Los Angeles, and is active according to the California Secretary of State, however PLAINTIFF is further informed and believes, and on that basis alleges, that in or about October 2013 FDP and Focus Features combined, and operate FOCUS WORLD as an alternative distribution arm. According to IMDB, FDP is one of the Production Companies producing the Film.

11.     PLAINTIFF is informed and believes, and on that basis alleges, that Defendant LAKESHORE ENTERTAINMENT CORP. (hereinafter referred to as "LEC" or "DEFENDANT") is a corporation existing under the laws of Delaware doing business in California and maintaining its principal place of business at 9268 West Third Street, Beverly Hills, California 90210. PLAINTIFF is informed and believes, and on that basis alleges, that LEC is qualified to do business and is doing business in the State of California, County of Los Angeles. PLAINTIFF is informed and believes, and on that basis alleges, that Lakeshore Entertainment is a film production company and distributor, with numerous film credits, and according to IMDB is one of the Production Companies associated with the Film.

12.     PLAINTIFF is informed and believes, and on that basis alleges, that Defendant LAKESHORE ENTERTAINMENT GROUP LLC (hereinafter referred to as "LEGL" or "DEFENDANT") is a limited liability company existing under the laws of California maintaining its principal place of business at 9268 West Third Street, Beverly Hills, California 90210.   PLAINTIFF is informed and believes, and on that basis alleges, that LEGL is qualified to do business and is doing business in the State of California, County of Los Angeles.   PLAINTIFF is informed and believes, and on that basis alleges, that Lakeshore Entertainment is a film production company and distributor, with numerous film credits, and according to IMDB is one of the Production Companies associated with the Film.

13.     The true names and capacities, whether individual, corporate, associate or otherwise, of Defendants DOES 1 through 10, inclusive, are presently unknown to PLAINTIFF, who therefore sues these Defendants by such fictitious names.  PLAINTIFF is informed and believes and thereon allege that each of the DOE Defendants was and is either intentionally, negligently, or in some other manner, the cause or contributing cause of, or otherwise responsible for, the damages suffered by PLAINTIFF.   PLAINTIFF will amend this Complaint to

allege the true names and capacities of each DOE Defendant, together with such allegations as may be appropriate, when their names have been ascertained.

14.     Plaintiff is informed and believes and thereon alleges that at all times mentioned in this Complaint, each Defendant was the agent, servant, employee, partner, successor, assignee, joint venturer and/or franchisee of each of the remaining Defendants herein, and was at all times acting within the course and scope of said agency, service, employment, partnership, joint venture and/or franchise.  Moreover, Plaintiff is informed and believes, and based thereon alleges, that each act and omission hereinafter alleged on the part of any one Defendant was done with the approval and consent and was ratified by each of the remaining Defendants.

15.     Plaintiff is further informed and believes and thereon allege that at all relevant times mentioned in this Complaint, each Defendant may be held liable for the infringing acts committed by another to the extent that each Defendant had the right and ability to control the infringing activities alleged herein and had a direct financial interest in such activities, regardless of whether each said Defendant had intent or knowledge of the infringement alleged herein.  Furthermore, Plaintiff is informed and believes and thereon alleges that at all relevant times mentioned in this Complaint each Defendant who knowingly induced, caused or materially contributed to the infringement alleged herein, by another Defendant herein but who may not have committed or participated in the infringing acts him or herself, may be held liable as a contributory infringer as each such Defendant had knowledge, or reason to know, of the infringement.

## BACKGROUND FACTS

16.     Plaintiff Shame On You Productions, Inc., is the owner and copyright proprietor through a valid assignment (the "Assignment") of an original motion picture screenplay entitled "Darci's Walk of Shame" (the "Screenplay").   The

Screenplay was created and written by Dan Rosen ("ROSEN").  PLAINTIFF is the contractual assignee and owner of all rights including all rights under contract and copyright, and to any and all claims possessed by ROSEN, with respect to the Screenplay and all drafts and versions of it. An early version of the Screenplay was registered with the Writers Guild of America, East ("WGA") on or about November 17, 2006, with registration number 145107.  Subsequently, the Assignment and relevant versions of the Screenplay have been registered for copyright registration with the United States Copyright Office. PLAINTIFF reserves the right to amend this Complaint upon its receipt of conformed registrations.  (True and correct copies of the receipts for the copyright registrations, as well as for the registration of the Assignment, are attached hereto and incorporated by reference herein as Exhibits "1" and "2," respectively.)

17.    On or about July 31, 2007, ROSEN forwarded by email a draft of the Screenplay to an actor who was mutual acquaintances with actress and producer Elizabeth Banks ("BANKS") and who had suggested to ROSEN that BANKS should be considered to play the lead character of "Darci."  ROSEN agreed and communicated that he too was interested in BANKS playing the role, authorized the mutual acquaintance to forward a draft of the Screenplay to BANKS and/or set up a meeting with BANKS specifically to seek her involvement acting in a motion picture based on such Screenplay.

18.    Consequently, approximately a week later a meeting was set up through the mutual acquaintance on or about August 5, 2007, wherein ROSEN met in person with actress and producer Elizabeth Banks ("BANKS"), her husband and producing partner Max HANDELMAN ("HANDELMAN"), and the mutual acquaintance at the restaurant Mexicali, located at 12161 Ventura Blvd, Studio City, California 91604, in order to discuss the Screenplay.  The meeting lasted approximately three (3) hours, wherein Mr. Rosen extensively discussed the

Screenplay, including the plot, story, characters, sequence of events, themes, and incidents portrayed in such fictional work.  ROSEN brought another draft of the Screenplay and submitted it in person to BANKS and HANDELMAN.  A further purpose of the meeting and submission of the Screenplay to BANKS and HANDELMAN was to seek their interest in developing and/or purchasing the Screenplay, *inter alia*. PLAINTIFF is informed and believes that both BANKS and HANDELMAN were aware of ROSEN's expertise and involvement in the film business as a producer, screenwriter, and director at the time of the meeting.  Both drafts of the Screenplay have been submitted for registration of copyright with the United States Copyright Office, and all versions of the Screenplay are the subject of a valid Assignment of rights to PLAINTIFF.  (See Exs. "1" - "2.")

19.     BANKS and HANDELMAN expressed their interest in the Screenplay at the meeting, and communicated to ROSEN that they liked the idea and would get back to ROSEN soon after reading the Screenplay version submitted to them on or about August 5, 2007.  At the time the material was presented to BANKS, HANDELMAN and their co-DEFENDANTS, they were aware of the fact and agreed that the Screenplay had been presented to them with a clear understanding that if elements of the Screenplay were to be used by DEFENDANTS, they must first obtain rights in and to the Screenplay in exchange for appropriate compensation to be agreed upon in accordance with entertainment industry custom and practice.

20.     Contrary to their representations, neither BANKS nor HANDELMAN ever got back to ROSEN about the Screenplay.  Although ROSEN attempted reaching out to HANDELMAN by email the day after the meeting and once again a few days later, nothing further transpired and there were no further communications from BANKS or HANDELMAN to ROSEN regarding the project.  However, neither BANKS nor HANDELMAN ever passed on the project.

Moreover, BANKS and HANDELMAN retained the Screenplay, and never returned any version of it.

21.   The Screenplay was also sent out for consideration for development to various production companies and talent agencies during the relevant timeframe including 2007 to 2008.

22.   Years later following the 2007 lunch at Mexicali, in or about January 2014, PLAINTIFF became aware of an article appearing in Deadline Hollywood announcing that BANKS was starring in a motion picture entitled "Walk of Shame" (the "Film"), and included a first trailer for the Film.  The article announced that defendant Steven Brill ("BRILL") had written and directed the Film, that defendant FOCUS WORLD was the distributor, and that a release date was scheduled for April 25, 2014.

23.   A recent review of the Internet Movie Database ("IMDB") webpage for the Film "Walk of Shame" and the promotional movie poster found therein and elsewhere confirms that Elizabeth Banks stars in the Film; that Steven Brill is the director and writer; that Sidney Kimmel Entertainment, Film District, and Lakeshore Entertainment are the production companies; that Focus World is the US distributor; and that the Film was released theatrically, digitally and on pay per view on May 2, 2014 in the United States.  Additionally, recent internet searches for "Walk of Shame" with the United States Copyright Office reveal a number of recorded documents pertaining to such title, including a short form option and a short form assignment between defendants Steven Brill and Brillco, Inc. on the one hand and Lakeshore Entertainment Group, LLC on the other hand, *inter alia*.

24.   PLAINTIFF is informed and believes and on that basis alleges, that the more recent work, "Walk of Shame," borrows heavily from the "Darci's Walk of Shame" Screenplay.  Comparing the Screenplay to the film "Walk of Shame," the plots, stories, characters, sequence of events, themes, and incidents portrayed in

the two works are fictional and, in many respects, the elements in the two works are virtually identical.  These substantially, if not strikingly, similar elements, coupled with DEFENDANTS' direct access through BANKS and HANDELMAN to PLAINTIFF's "Darci's Walk of Shame" in addition to dissemination of the Screenplay for consideration for development to various production companies and talent agencies during the relevant timeframe including 2007 to 2008, leave little doubt that numerous substantive original elements of "Walk of Shame" are copied from the Screenplay submitted to DEFENDANTS in or about August 2007.

25.   In 2014, on a number of occasions PLAINTIFF through counsel corresponded with DEFENDANTS and requested copies of all versions of the screenplays of "Walk of Shame" and all script development notes, *inter alia*, in connection with PLAINTIFF's investigation of whether notwithstanding the foregoing, that "Walk of Shame" was somehow independently created. Such efforts were spurned by DEFENDANTS who refused to produce any such materials. (True and correct copies of such correspondence are collectively attached hereto and incorporated by reference herein as Ex. "3.")

## **FIRST CLAIM FOR RELIEF**

### **(COPYRIGHT INFRINGEMENT (17 U.S.C. §§101 *et seq.*))**

### **(Against all Defendants)**

26.   PLAINTIFF re-alleges each and every allegation set forth in Paragraphs 1 through 25, inclusive, and incorporates them herein by this reference.

27.   PLAINTIFF is currently and at relevant times has been the sole proprietor of all right, title, and interest in and to the copyrights in the Screenplay.

28.   To date, DEFENDANTS have stymied PLAINTIFF's "due diligence" efforts to ascertain the true derivation of the Film. PLAINTIFF is informed and believes that DEFENDANTS are proceeding with efforts to distribute "Walk of Shame" in derogation of PLAINTIFF's rights.

29.    Furthermore, given the direct access and prior submission of the Screenplay to DEFENDANTS through BANKS and HANDELMAN and personal meeting by PLAINTIFF's assignor with BANKS and HANDELMAN to discuss exploitation of the same, in addition to dissemination of the Screenplay for consideration for development to various production companies and talent agencies during the relevant timeframe including 2007 to 2008, PLAINTIFF is informed and believes, and on that basis alleges, that DEFENDANTS were knowingly and willfully involved in the copying of the Screenplay and original elements therein to create a work substantially similar to and derivative of PLAINTIFF's copyrighted Screenplay.  PLAINTIFF is informed and believes that a non-exhaustive summary of substantial similarities including expressions of ideas and concepts between the respective works based upon a review of the film "Walk of Shame" includes but is not limited to:

(a) THEME

Each work has as a core theme of comedy, embarrassment, and irony following a grown woman's "walk of shame" (mis)adventure that she is much too old for, and each shares the unique element that the woman is a professional in her 30's, and not the typical 18-21 year-old college girl embarking on a classic "walk of shame" scenario.  Indeed, general internet searches for the phrase "walk of shame" almost exclusively return results depicting a young girl in a college scenario. This element is one of the key unique elements in the Screenplay as it gives rise to a series of events and (mis)adventures which are unique to an older professional woman and which would not likely occur to the typical younger single girl, and is strikingly similar in the Film.

(b) PLOT

The plot in both works follows a pretty blonde but prudent woman (a "good girl") in her thirties living in a big city who goes through a break up with her

boyfriend, commiserates with her best girlfriends (one of whom is sexual and foul-mouthed), gets drunk, spends a "one-nighter" with a younger man she just met who works as a busboy/bartender, wakes up the next morning at his place, and puts on her inappropriate outfit from the night before.  Then in each she embarks on a "walk of shame" embarrassing (mis)adventure without a phone, identification, or money that takes her across the city as she desperately tries to get to an important event.  Although in both works she miraculously makes it in time for the important event, nearly avoiding revealing her shameful story, she nonetheless forcefully and publicly reveals the embarrassing truth of her (mis)adventures from the last evening and day, but is ultimately able to find meaningful romance with the nice guy for once who helped her through her ordeal.

### (c) SETTING

The setting of each work takes place in a large city, where the lead female embarks on a journey throughout the city in order to arrive at an important event.

### (d) CHARACTERS

The lead characters, notwithstanding their names "Darci" vs. "Meghan," are strikingly similar.  Both works feature as the lead character a pretty blonde but prudent woman (a "good girl") in her thirties who is wearing an inappropriate brightly-colored dress throughout most of the work, which is referenced extensively and acts almost as an additional character; a male lead who is a nice guy with a number of occupations who helps the lead character reach her destination and ultimately find lasting romance with him; a taxi driver who keeps showing up; and a loud mouthed swearing female best friend and confidant, who provides comedic relief.

### (e) MOOD

Both works have a similar mood in that they are comedic farces which begin with the melancholy of a breakup, then excitement of a night of partying/drinking,

the resulting embarrassment and anxiety of a "walk of shame" the morning after a "one night stand" juxtaposing an improbable journey to an extremely important event, and the unlikely romance developed at the end with the nice guy who helped her get through the ordeal.

### (f) PACE

The pace of each work is extremely similar. Both are fast-paced comedies punctuated with an on-going, never ending and continuing series of embarrassing but comical mini-adventures.

### (g) SEQUENCE OF EVENTS

Similar to the plot, the sequence of key events in both works follows a pretty blonde but prudent woman (a "good girl") in her thirties from a big city who goes through a break up with her boyfriend, commiserates with her best girlfriends (one of whom is foul-mouthed), gets drunk, spends the night with a younger man she just met who works as a busboy/bartender, wakes up the next morning at his place, puts on her inappropriate outfit from the night before, and then embarks on a "walk of shame" (mis)adventure without a phone, identification, or money that takes her across the city as she desperately tries to pull things together in order to get to an important event. Although she miraculously makes it in time for the big event, she forcefully and publicly reveals the embarrassing truth of her (mis)adventures from the last evening and day, but is ultimately able to find meaningful romance with the nice guy for once who helped her out along the way and through her ordeal.

### (h) SCENE/DIALOGUE SIMILARITIES

A non-exhaustive list of some of the specific scene and/or dialogue similarities between each work is set forth below, with referenced page numbers and time codes without limitation:

| DARCI'S WALK OF SHAME | WALK OF SHAME |
|---|---|
| *1.  Title Page:  Title includes "Walk of Shame"* | *1.  Film Title: Title includes "Walk of Shame"* |
| 2.  Lead character Darci ("Lead") is a good girl ("I'm sure I wouldn't know" in response to "wonder what those Trixies were up to last night?;" "[Darci] you're my good girl. Not like these hookers"). [pgs. 2; 27] | 2.  Lead character Meghan ("Lead") is a good girl ("I'm a good girl" during interview; her boss: "Meghan Miles is a good girl."). [0:04; 1:03.] |
| 3.  Lead finds her boyfriend cheating on her and they break up, which coincides with an important life event (her best friend's wedding). She is now suddenly single. [pg. 3] | 3.  Lead reveals her and her boyfriend have broken up, which coincides with an important life event (she is up for a big promotion).  She is now suddenly single. [0:08].  She later learns he is cheating on her/there is another woman.  [0:40] |
| 4.  A red-head is chosen over Lead (her boyfriend's cheating on her with red-head Virginia). [pg. 2] | 4.  A red-head is chosen over Lead (red-head Wendy Chang (adopted) is getting the job instead of her). [0:09] |
| 5.  Lead has a break down in front of taxi driver. [pg. 5]  Lead feels awkward and embarrassed about the breakup (amongst honeymooning couples on the flight, "flying alone" "today and every day," checking into | 5.  Lead has a break down in front of a taxi driver and friends. [0:08; 0:24-25] Lead feels awkward and embarrassed about the breakup ("It's really embarrassing.") |

| | |
|---|---|
| hotel alone with special lover's escape upgrade, alone at the wedding) [pg. 7-11, 29-30] | |
| 6.  Lead also has a break down in front of a child. [pg. 6-7] | 6.  Lead also has a break down in front of a child. [1:05] |
| 7.  Lead tells her friends that she and her boyfriend broke up. Lori and her other best friend Deena give Lead advice re: men. [pg. 17] | 7.  Lead tells her friends that she and her boyfriend broke up. Rose and her other best friend Denise give Lead advice re: men. [0:08-10] |
| 8.  Lead's foul mouthed sexual friend Lori has a catch-phrase when it comes to men ("be the flame, not the moth") [pgs. 16-17] | 8.  Lead's foul mouthed sexual friend Rose has a catch-phrase when it comes to men ("don't block the c*ck"). [0:05; 0:09-10] |
| 9.  Lead is a "relationship" type girl, not a "one night stand" type girl.  ("I'm the master of the three month long term relationship.") [pg. 26] | 9.  Lead is a "relationship" type girl, not a "one night stand" type girl. ("I'm a relationship type girl.") [0:10] |
| 10. When meeting up with friends, Lead is covered up in a modest, non-revealing outfit and is teased by her friends. ("Ooh. Sexy.") [pg. 14] | 10. When meeting up with friends, Lead is covered up in a modest, non-revealing outfit and is teased by her friends. ("Wear something slutty like Denise.") [0:10] |
| 11. After breakdown Lead gets drunk, and vomits. [pgs. 6-7] | 11. After breakdown Lead gets drunk, and vomits. [0:10-12] |
| 12. Lead goes out dressed in a sexy outfit to try to feel good about | 12. Lead goes out dressed in a sexy outfit to try to feel good about |

| | |
|---|---|
| herself. [pgs. 19-20] | herself. [0:10-12] |
| 13. Lead while heading to the rest room bumps into cute JUSTIN, a younger good looking charming bus boy who has been serving her drinks all night. [pg. 30] | 13. Lead while looking for the rest room bumps into cute GORDON, ["Romantic Lead"] a younger good looking charming bartender who has been serving her drinks all night. [0:13] |
| 14. JUSTIN and Lead end up going back to his place; he drives because she is too drunk. [pg. 30] | 14. GORDON and Lead go back to his place; he drives because she is too drunk. [0:15] |
| 15. Lead wakes up the next morning in JUSTIN's bed, hung over and confused. [pg. 30] | 15. Lead wakes up the next morning in GORDON's bed, hung over and confused. [0:18] |
| 16. Pizza boxes and beer cans are strewn about JUSTIN's room, which is a mess. [pg. 29] | 16. Pizza boxes and beer cans are strewn about GORDON's apartment, which is a mess. [0:18; 0:30] |
| 17. JUSTIN tries to remember Lead's name. [pg. 30] | 17. GORDON tries to remember Lead's name. [0:30] |
| 18. Attention is drawn to the specific location where Lead's brightly colored dress is draped. [pg. 30] | 18. Attention is drawn to the specific location where Lead's brightly colored dress is draped. [0:19] |
| 19. Lead does not have her cell phone or her purse, but does eventually find car keys. [pg. 30; 42] | 19. Lead does not have her cell phone or her purse, but does find car keys. [0:18] |
| 20. Lead looks in the mirror at | 20. Lead looks in the mirror at |

| | |
|---|---|
| JUSTIN's place and realizes she is a mess, a combination of smeared makeup and horrible bed hair. [pg. 34] | GORDON's place and realizes she is a mess, a combination of smeared makeup and horrible bed hair. [0:20] |
| 21. Lead has an important event she must get to that day (wedding farewell brunch). [pg. 35] | 21. Lead has an important event she must get to that day (final job interview/newscast viewing). [0:19] |
| 22. Lead steps out of the hotel to find car on the street, but it is not there. She sees a street sign which reads: "NO PARKING… CARS WILL BE TOWED..."  A disappointed Lead trudges back up to the hotel. [pg. 42] | 22. Lead steps out of the large apartment complex to find car on the street, but it is not there.  She sees a street sign which reads: "NO PARKING – TOWAWAY ZONE."  A disappointed Lead trudges back up to the complex.  [0:21] |
| 23. Lead gets back on the elevator to go back to JUSTIN's room, but can't remember his room number. ("ANGLE on the FLOOR BUTTON PANEL [in the elevator]- 23 FLOORS.") [pg. 41] | 23. Lead steps up to the complex's buzzer alcove to get back to GORDON's apartment, but can't remember his apartment number. (She looks at hundreds of buzzer buttons with last names, but has no idea what his name was.) [0:21-22] |
| 24. Lead pleads to a virginal/prude [hotel concierge] in hopes that she will help, to no avail; instead, she gets called a whore. [pgs. 37-40] | 24. Lead pleads to a virginal/prude [Hasidic Jew] in hopes that he will help her, to no avail; instead, she gets called a witch.  [0:56-58] |
| 25. Lead gets mistaken for a prostitute. | 25. Lead gets mistaken for a prostitute |

| | |
|---|---|
| ("Wait. You think I'm a hooker?... Do I look like a hooker?") [p. 40] | ("No, I'm not a hooker... I'm not a prostitute.") [0:27-28] |
| 26. Lead's recent ex shows up and Lead asks for his help, but he has a new woman alongside him. [pg. 77] | 26. Lead appeals to her recent ex for help, but he has a new woman alongside him. [0:39-41] |
| 27. Lead's ex gets emotional about/apologizes for the breakup. ("I'm sorry... you deserve a great guy... I was just waiting for you to tell me it was over.") [pgs. 79-80] | 27. Lead's ex gets emotional about/apologizes for the breakup. ("Breaking up was the hardest thing I ever did.") [0:40] |
| 28. Lead's adventures leave the city in shambles, and she is followed on a wild chase by authorities (steals a golf cart at the golf course, gets chased by club steward and golfers, golf balls are shot to stop her, carts are wrecked and porta-potties are knocked over, she hitches a ride in a pick-up truck with chickens which ends in a car crash). [pgs. 46-50, 57-58] | 28. Lead's adventures leave the city in shambles, and she is followed on a wild chase by authorities (gangster/drug-dealer confrontation, gunfire ensues, police chase her by car/on foot, news stories following her). [0:40-45] |
| 29. Lead steals a golf cart, an un-conventional mode of transportation, especially wearing an inappropriate dress. [pgs. 46-50] | 29. Lead steals a bicycle, an un-conventional mode of transportation, especially wearing an inappropriate dress. [1:05] |
| 30. Lead arrives at the tow lot without | 30. Lead arrives at the tow lot without |

| | |
|---|---|
| ID but has the key and tries to claim car, to no avail. She appeals to the tow lot employee by saying: "The car's right there- all you have to do is open the gate…" (pg. 50) | ID but has the key and tries to claim car, to no avail. She appeals to the tow lot employee by saying: "I have the key, it's right here… Look, turn around, you'll see it…" [1:16-18] |
| 31. Lead shamefully tries to explain everything that has happened to her to tow lot worker who wants to help her but his hands are tied, because Lead's purse/money are at her hotel. Lead does not know JUSTIN's last (name). [pgs. 51-53] | 31. Lead shamefully tries to explain everything that has happened to her to tow lot worker who "is trying to help her" but her hands are tied, because Lead's purse/money are in her car. Lead does not know GORDON's (address). [1:1-18] |
| 32. Lead walks in on a religious ceremony/place of worship clearly not appropriately dressed, causing a scene. [pgs. 54-55] | 32. Lead walks in on a religious ceremony/place of worship clearly not appropriately dressed, causing a scene. [0:56-58] |
| 33. Lead goes to a spa. [pgs. 23-28] | 33. Lead goes to a spa. [1:09] |
| 34. Lead has a run-in with a homeless woman wearing dirty old rags, and gets defensive. [pg. 1] | 34. Lead has a run-in with a homeless woman wearing dirty old rags, and gets defensive. [0:54; 1:13] |
| 35. Nice guy Nathan ("Romantic Lead") shows up to help Lead. [pg. 60] | 35. Nice guy Gordon ("Romantic Lead") shows up to help Lead. [1:20] |
| 36. Romantic Lead has multiple jobs (taxi driver, volunteer fireman, helicopter pilot) [pgs. 61, 66] | 36. Romantic Lead has multiple jobs (bartender, writer) [0:15] |

| | |
|---|---|
| 37. The same taxi driver continues to show up throughout Lead's journey. [pgs. 7, 61, 95] | 37. The same taxi driver continues to show up throughout Lead's journey. [0:22; 1:09] |
| 38. Lead gets a ride on a helicopter so that she can get to her destination just in time and save the day. [pg. 66] | 38. Lead gets a ride on a helicopter so that she can get to her destination just in time and save the day. [1:22] |
| 39. Lead chooses to proudly go public with her tattered inappropriate outfit and matted hair from the night before, when she could have covered it up.  [pg. 94] | 39. Lead chooses to proudly go public with her tattered inappropriate outfit and matted hair from the night before, when she could have covered it up.  [1:24] |
| 40. Lead makes it to her important destination and almost catches a break in avoiding revealing her embarrassing story of the last evening and day, but forcefully and publicly reveals the embarrassing truth.  [pgs. 95-105] | 40. Lead makes it to her important destination and almost catches a break in avoiding revealing her embarrassing story of the last evening and day, but forcefully and publicly reveals the embarrassing truth.  [1:24-27] |
| 41. Lead's big reveal cuts to several close friends who have helped her along the way (best friends Lori and Deena, bride's parents, Aunt Bertha, etc.) [pgs. 96-99] | 41. Lead's big reveal cuts to several close friends who have helped her along the way (best friends Rose and Denise, Pookie, Skrilla and gang, etc.) [1:24-27] |
| 42. Lead and Romantic Lead end up together, despite Lead's | 42. Lead and Romantic Lead end up together, despite Lead's |

| embarrassing public reveal. [pg. 107] | embarrassing public reveal. [1:29] |
|---|---|

30.    PLAINTIFF is further informed and believes, and on that basis alleges, that DEFENDANTS' copying of the Screenplay infringes PLAINTIFF's copyright and that DEFENDANTS are distributing and intend to continue to distribute unauthorized works similar to and derivative of "Darci's Walk of Shame."

31.    The natural, probable and foreseeable result of DEFENDANTS' wrongful conduct has been and will continue to be to deprive PLAINTIFF of the benefits of selling the Screenplay to another buyer, and to deprive PLAINTIFF of the goodwill that would necessarily be associated therewith.

32.    PLAINTIFF is informed and believes, and on that basis alleges, that it has lost and will continue to lose substantial revenues from the sale of "Walk of Shame" and has sustained damages as a result of DEFENDANTS' wrongful conduct and DEFENDANTS' production and sale of their infringing film. DEFENDANTS' wrongful conduct has also deprived and will continue to deprive PLAINTIFF of opportunities for expanding its goodwill.

33.    PLAINTIFF is informed and believes, and on that basis alleges, that unless enjoined by this Court, DEFENDANTS intend to continue their course of conduct and to wrongfully use, infringe upon, sell and otherwise profit from PLAINTIFF's Screenplay and works derived from it.  As a direct and proximate result of the acts of DEFENDANTS alleged above, PLAINTIFF has already suffered irreparable damage and has sustained lost profits.  PLAINTIFF has no adequate remedy at law to redress all of the injuries that DEFENDANTS have caused and intend to cause by their conduct.  PLAINTIFF will continue to suffer

irreparable damage and sustain lost profits until DEFENDANTS' actions alleged above are enjoined by this Court.

34.     By their actions alleged above, DEFENDANTS have infringed and will continue to infringe PLAINTIFF's copyright in and relating to the Screenplay by producing, distributing, and placing upon the market products which are derivative of PLAINTIFF's copyrighted Screenplay.

35.     PLAINTIFF is entitled to an injunction restraining DEFENDANTS, their officers, agents and employees, and all persons acting in concert with them, from engaging in any further such acts in violation of the copyright laws.

36.     PLAINTIFF is further entitled to recover from DEFENDANTS the damages, including attorneys' fees, they have sustained and will sustain, and any gains, profits and advantages obtained by DEFENDANTS as a result of DEFENDANTS' acts of infringement alleged above.  At present, the amount of such damages, gains, profits and advantages cannot be fully ascertained by PLAINTIFF but PLAINTIFF is informed and believes that such damages equal or exceed $500,000.

## SECOND CLAIM FOR RELIEF

### (BREACH OF IMPLIED-IN-FACT CONTRACT)

### (Against all Defendants)

37.     PLAINTIFF incorporates herein the allegations of paragraphs 1 through 25 of this Complaint.

38.     PLAINTIFF is the contractual assignee and owner of all rights including all rights under contract and copyright, and to any and all claims possessed by ROSEN, with respect to the Screenplay and all drafts and versions of it.  A meeting was set up through a mutual acquaintance of ROSEN on or about August 5, 2007, wherein ROSEN met in person with actress and producer Elizabeth Banks ("BANKS"), her husband and producing partner Max

HANDELMAN ("HANDELMAN"), and the mutual acquaintance at the restaurant Mexicali, located at 12161 Ventura Blvd, Studio City, California 91604, in order to discuss the Screenplay. The meeting lasted approximately three (3) hours, wherein Mr. Rosen extensively discussed the Screenplay, including the story, characters, sequence of events, themes, and incidents portrayed in such fictional work. ROSEN brought a copy of a draft of the Screenplay and submitted it in person to BANKS and HANDELMAN. A further purpose of the meeting and submission to BANKS and HANDELMAN was to seek their interest in developing and/or purchasing the Screenplay, *inter alia*.

39. BANKS and HANDELMAN expressed their interest in the Screenplay at the meeting, and communicated to ROSEN that they liked the idea and would get back to ROSEN shortly after reading the Screenplay. At the time the material was presented to DEFENDANTS, they were aware of the fact and agreed that the Screenplay had been presented to them with a clear understanding that if elements of the Screenplay were to be used by DEFENDANTS, they must first obtain rights in and to the Screenplay in exchange for appropriate compensation to be agreed upon in accordance with entertainment industry custom and practice.

40. Based on the expressed interest of DEFENDANTS BANKS and HANDELMAN and at their instance and request, PLAINTIFF's assignor submitted to DEFENDANTS at the meeting, orally and in writing, a novel idea for a screenplay, with the expectation, which was fully and clearly understood by DEFENDANTS, that PLAINTIFF's assignor would be compensated for its use by DEFENDANTS when and if DEFENDANTS used it.

41. When the material was presented to DEFENDANTS through BANKS and HANDELMAN, they were aware of the fact that the Screenplay had been presented to them with a clear understanding that if any elements of the Screenplay

were to be used by DEFENDANTS, they must first obtain rights from the writer/copyright proprietor of the Screenplay in exchange for appropriate compensation in accordance with entertainment industry custom and practice, and DEFENDANTS knew, or should have known, based on the parties' course of conduct including oral representations creating a reasonable expectation, that the submission was conditioned on DEFENDANTS' agreement to provide the writer/copyright proprietor with such compensation. PLAINTIFF is informed and believes that both BANKS and HANDELMAN were aware of ROSEN's expertise and involvement in the film business as a producer, screenwriter, and director at the time of the meeting.

42. Contrary to their representations, neither BANKS nor HANDELMAN ever got back to ROSEN about the Screenplay. Although ROSEN attempted reaching out to HANDELMAN by email the day after the meeting and once again approximately a few days later, nothing further transpired and there were no further communications from BANKS or HANDELMAN to ROSEN regarding the project.

43. To date, BANKS and HANDELMAN never passed on the Screenplay. Indeed, PLAINTIFF's Screenplay has never been returned and PLAINTIFF is informed and believes that the Screenplay is still in BANKS' and HANDELMAN's possession.

44. The submission of the Screenplay to DEFENDANTS through BANKS and HANDELMAN was clearly conditioned on the agreement to compensate PLAINTIFF's assignor for the use of the Screenplay, and DEFENDANTS knew, or should have known, that PLAINTIFF's assignor's submission was conditioned on their agreement to provide PLAINTIFF's assignor with such compensation.

45.   DEFENDANTS through BANKS and HANDELMAN voluntarily accepted the submission of the Screenplay on PLAINTIFF's assignor's terms, and the foregoing course of conduct between the parties gave rise to an implied-in-fact contract between the parties to the effect that DEFENDANTS would not exploit the Screenplay without compensating PLAINTIFF's assignor for DEFENDANTS' use of the ideas submitted by them within the Screenplay.

46.   PLAINTIFF is informed and believes, and on that basis alleges, that in creating their film "Walk of Shame," DEFENDANTS actually used the ideas and original elements contained in the Screenplay previously submitted to DEFENDANTS through BANKS and HANDELMAN and that DEFENDANTS based their film "Walk of Shame" substantially upon the ideas of PLAINTIFF's assignor rather than their own ideas or ideas from other sources. PLAINTIFF is informed and believes that a non-exhaustive summary of substantial similarities including ideas and concepts between the respective works based upon a review of the film "Walk of Shame" includes but is not limited to:

<u>(a) THEME</u>

Each work has as a core theme of comedy, embarrassment, and irony following a grown woman's "walk of shame" (mis)adventure that she is much too old for, and each shares the unique element that the woman is a professional in her 30's, and not the typical 18-21 year-old college girl embarking on a classic "walk of shame" scenario.  Indeed, general internet searches for the phrase "walk of shame" almost exclusively return results depicting a young girl in a college scenario. This element is one of the key unique elements in the Screenplay as it gives rise to a series of events and (mis)adventures which are unique to an older professional woman and which would not likely occur to the typical younger single girl, and is strikingly similar in the Film.

### (b) PLOT

The plot in both works follows a pretty blonde but prudent woman (a "good girl") in her thirties living in a big city who goes through a break up with her boyfriend, commiserates with her best girlfriends (one of whom is sexual and foul-mouthed), gets drunk, spends a "one-nighter" with a younger man she just met who works as a busboy/bartender, wakes up the next morning at his place, and puts on her inappropriate outfit from the night before.  Then in each she embarks on a "walk of shame" embarrassing (mis)adventure without a phone, identification, or money that takes her across the city as she desperately tries to get to an important event.  Although in both works she miraculously makes it in time for the important event, nearly avoiding revealing her shameful story, she nonetheless forcefully and publicly reveals the embarrassing truth of her (mis)adventures from the last evening and day, but is ultimately able to find meaningful romance with the nice guy for once who helped her through her ordeal.

### (c) SETTING

The setting of each work takes place in a large city, where the lead female embarks on a journey throughout the city in order to arrive at an important event.

### (d) CHARACTERS

The lead characters, notwithstanding their names "Darci" vs. "Meghan," are strikingly similar.  Both works feature as the lead character a pretty blonde but prudent woman (a "good girl") in her thirties who is wearing an inappropriate brightly-colored dress throughout most of the work, which is referenced extensively and acts almost as an additional character; a male lead who is a nice guy with a number of occupations who helps the lead character reach her destination and ultimately find lasting romance with him; a taxi driver who keeps showing up; and a loud mouthed swearing female best friend and confidant, who provides comedic relief.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

(e) MOOD

Both works have a similar mood in that they are comedic farces which begin with the melancholy of a breakup, then excitement of a night of partying/drinking, the resulting embarrassment and anxiety of a "walk of shame" the morning after a "one night stand" juxtaposing an improbable journey to an extremely important event, and the unlikely romance developed at the end with the nice guy who helped her get through the ordeal.

(f) PACE

The pace of each work is extremely similar. Both are fast-paced comedies punctuated with an on-going, never ending and continuing series of embarrassing but comical mini-adventures.

(g) SEQUENCE OF EVENTS

Similar to the plot, the sequence of key events in both works follows a pretty blonde but prudent woman (a "good girl") in her thirties from a big city who goes through a break up with her boyfriend, commiserates with her best girlfriends (one of whom is foul-mouthed), gets drunk, spends the night with a younger man she just met who works as a busboy/bartender, wakes up the next morning at his place, puts on her inappropriate outfit from the night before, and then embarks on a "walk of shame" (mis)adventure without a phone, identification, or money that takes her across the city as she desperately tries to pull things together in order to get to an important event. Although she miraculously makes it in time for the big event, she forcefully and publicly reveals the embarrassing truth of her (mis)adventures from the last evening and day, but is ultimately able to find meaningful romance with the nice guy for once who helped her out along the way and through her ordeal.

## (h) SCENE/DIALOGUE SIMILARITIES

A  non-exhaustive  list  of  some  of  the  specific  scene  and/or  dialogue similarities between each work is set forth below, with referenced page numbers and time codes without limitation:

DARCI'S WALK OF SHAME                    WALK OF SHAME

| | |
|---|---|
| *1.* *Title Page:  Title includes "Walk of Shame"* | *1.* *Film Title: Title includes "Walk of Shame"* |
| 2.  Lead character Darci ("Lead") is a good girl ("I'm sure I wouldn't know" in response to "wonder what those Trixies were up to last night?;" "[Darci] you're my good girl. Not like these hookers"). [pgs. 2; 27] | 2.  Lead character Meghan ("Lead") is a good girl ("I'm a good girl" during interview; her boss: "Meghan Miles is a good girl."). [0:04; 1:03.] |
| 3.  Lead finds her boyfriend cheating on her and they break up, which coincides with an important life event (her best friend's wedding). She is now suddenly single. [pg. 3] | 3.  Lead reveals her and her boyfriend have broken up, which coincides with an important life event (she is up for a big promotion).  She is now suddenly single. [0:08.]  She later learns he is cheating on her/there is another woman.  [0:40] |
| 4.  A red-head is chosen over Lead (her boyfriend's cheating on her with red-head Virginia). [pg. 2] | 4.  A red-head is chosen over Lead (red-head Wendy Chang (adopted) is getting the job instead of her). [0:09] |
| 5.  Lead has a break down in front of taxi driver. [pg. 5]  Lead feels | 5.  Lead has a break down in front of a taxi driver and friends. [0:08; 0:24- |

| | |
|---|---|
| awkward and embarrassed about the breakup (amongst honeymooning couples on the flight, "flying alone" "today and every day," checking into hotel alone with special lover's escape upgrade, alone at the wedding) [pg. 7-11, 29-30] | 25] Lead feels awkward and embarrassed about the breakup ("It's really embarrassing.") |
| 6.  Lead also has a break down in front of a child. [pg. 6-7] | 6.  Lead also has a break down in front of a child. [1:05] |
| 7.  Lead tells her friends that she and her boyfriend broke up. Lori and her other best friend Deena give Lead advice re: men. [pg. 17] | 7.  Lead tells her friends that she and her boyfriend broke up. Rose and her other best friend Denise give Lead advice re: men. [0:08-10] |
| 8.  Lead's foul mouthed sexual friend Lori has a catch-phrase when it comes to men ("be the flame, not the moth") [pgs. 16-17] | 8.  Lead's foul mouthed sexual friend Rose has a catch-phrase when it comes to men ("don't block the c*ck"). [0:05; 0:09-10] |
| 9.  Lead is a "relationship" type girl, not a "one night stand" type girl.  ("I'm the master of the three month long term relationship.") [pg. 26] | 9.  Lead is a "relationship" type girl, not a "one night stand" type girl. ("I'm a relationship type girl.") [0:10] |
| 10. When meeting up with friends, Lead is covered up in a modest, non-revealing outfit and is teased by her friends. ("Ooh. Sexy.") [pg. 14] | 10. When meeting up with friends, Lead is covered up in a modest, non-revealing outfit and is teased by her friends. ("Wear something slutty like Denise.") [0:10] |

| | |
|---|---|
| 11. After breakdown Lead gets drunk, and vomits. [pgs. 6-7] | 11. After breakdown Lead gets drunk, and vomits. [0:10-12] |
| 12. Lead goes out dressed in a sexy outfit to try to feel good about herself. [pgs. 19-20] | 12. Lead goes out dressed in a sexy outfit to try to feel good about herself. [0:10-12] |
| 13. Lead while heading to the rest room bumps into cute JUSTIN, a younger good looking charming bus boy who has been serving her drinks all night. [pg. 30] | 13. Lead while looking for the rest room bumps into cute GORDON, ["Romantic Lead"] a younger good looking charming bartender who has been serving her drinks all night. [0:13] |
| 14. JUSTIN and Lead end up going back to his place; he drives because she is too drunk. [pg. 30] | 14. GORDON and Lead go back to his place; he drives because she is too drunk. [0:15] |
| 15. Lead wakes up the next morning in JUSTIN's bed, hung over and confused. [pg. 30] | 15. Lead wakes up the next morning in GORDON's bed, hung over and confused. [0:18] |
| 16. Pizza boxes and beer cans are strewn about JUSTIN's room, which is a mess. [pg. 29] | 16. Pizza boxes and beer cans are strewn about GORDON's apartment, which is a mess. [0:18; 0:30] |
| 17. JUSTIN tries to remember Lead's name. [pg. 30] | 17. GORDON tries to remember Lead's name. [0:30] |
| 18. Attention is drawn to the specific location where Lead's brightly colored dress is draped. [pg. 30] | 18. Attention is drawn to the specific location where Lead's brightly colored dress is draped. [0:19] |

| | |
|---|---|
| 19. Lead does not have her cell phone or her purse, but does eventually find car keys. [pg. 30; 42] | 19. Lead does not have her cell phone or her purse, but does find car keys. [0:18] |
| 20. Lead looks in the mirror at JUSTIN's place and realizes she is a mess, a combination of smeared makeup and horrible bed hair. [pg. 34] | 20. Lead looks in the mirror at GORDON's place and realizes she is a mess, a combination of smeared makeup and horrible bed hair. [0:20] |
| 21. Lead has an important event she must get to that day (wedding farewell brunch). [pg. 35] | 21. Lead has an important event she must get to that day (final job interview/newscast viewing). [0:19] |
| 22. Lead steps out of the hotel to find car on the street, but it is not there. She sees a street sign which reads: "NO PARKING… CARS WILL BE TOWED…"  A disappointed Lead trudges back up to the hotel. [pg. 42] | 22. Lead steps out of the large apartment complex to find car on the street, but it is not there.  She sees a street sign which reads: "NO PARKING – TOWAWAY ZONE."  A disappointed Lead trudges back up to the complex.  [0:21] |
| 23. Lead gets back on the elevator to go back to JUSTIN's room, but can't remember his room number. ("ANGLE on the FLOOR BUTTON PANEL [in the elevator]- 23 FLOORS.") [pg. 41] | 23. Lead steps up to the complex's buzzer alcove to get back to GORDON's apartment, but can't remember his apartment number. (She looks at hundreds of buzzer buttons with last names, but has no idea what his name was.) [0:21-22] |
| 24. Lead pleads to a virginal/prude | 24. Lead pleads to a virginal/prude |

| | |
|---|---|
| [hotel concierge] in hopes that she will help, to no avail; instead, she gets called a whore. [pgs. 37-40] | [Hasidic Jew] in hopes that he will help her, to no avail; instead, she gets called a witch.  [0:56-58] |
| 25. Lead gets mistaken for a prostitute. ("Wait. You think I'm a hooker?... Do I look like a hooker?") [p. 40] | 25. Lead gets mistaken for a prostitute ("No, I'm not a hooker... I'm not a prostitute.")  [0:27-28] |
| 26. Lead's recent ex shows up and Lead asks for his help, but he has a new woman alongside him. [pg. 77] | 26. Lead appeals to her recent ex for help, but he has a new woman alongside him. [0:39-41] |
| 27. Lead's ex gets emotional about/apologizes for the breakup. ("I'm sorry... you deserve a great guy... I was just waiting for you to tell me it was over.") [pgs. 79-80] | 27. Lead's ex gets emotional about/apologizes for the breakup. ("Breaking up was the hardest thing I ever did.") [0:40] |
| 28. Lead's adventures leave the city in shambles, and she is followed on a wild chase by authorities (steals a golf cart at the golf course, gets chased by club steward and golfers, golf balls are shot to stop her, carts are wrecked and porta-potties are knocked over, she hitches a ride in a pick-up truck with chickens which ends in a car crash). [pgs. 46-50, 57-58] | 28. Lead's adventures leave the city in shambles, and she is followed on a wild chase by authorities (gangster/drug-dealer confrontation, gunfire ensues, police chase her by car/on foot, news stories following her). [0:40-45] |
| 29. Lead steals a golf cart, an un- | 29. Lead steals a bicycle, an un- |

| | |
|---|---|
| conventional mode of transportation, especially wearing an inappropriate dress. [pgs. 46-50] | conventional mode of transportation, especially wearing an inappropriate dress. [1:05] |
| 30. Lead arrives at the tow lot without ID but has the key and tries to claim car, to no avail. She appeals to the tow lot employee by saying: "The car's right there- all you have to do is open the gate…" (pg. 50) | 30. Lead arrives at the tow lot without ID but has the key and tries to claim car, to no avail. She appeals to the tow lot employee by saying: "I have the key, it's right here… Look, turn around, you'll see it…" [1:16-18] |
| 31. Lead shamefully tries to explain everything that has happened to her to tow lot worker who wants to help her but his hands are tied, because Lead's purse/money are at her hotel. Lead does not know JUSTIN's last (name). [pgs. 51-53] | 31. Lead shamefully tries to explain everything that has happened to her to tow lot worker who "is trying to help her" but her hands are tied, because Lead's purse/money are in her car.  Lead does not know GORDON's (address). [1:1-18] |
| 32. Lead walks in on a religious ceremony/place of worship clearly not appropriately dressed, causing a scene. [pgs. 54-55] | 32. Lead walks in on a religious ceremony/place of worship clearly not appropriately dressed, causing a scene. [0:56-58] |
| 33. Lead goes to a spa. [pgs. 23-28] | 33. Lead goes to a spa. [1:09] |
| 34. Lead has a run-in with a homeless woman wearing dirty old rags, and gets defensive. [pg. 1] | 34. Lead has a run-in with a homeless woman wearing dirty old rags, and gets defensive. [0:54; 1:13] |
| 35. Nice guy Nathan ("Romantic Lead") shows up to help Lead. [pg. 60] | 35. Nice guy Gordon ("Romantic Lead") shows up to help Lead. |

| | |
|---|---|
| | [1:20) |
| 36. Romantic Lead has multiple jobs (taxi driver, volunteer fireman, helicopter pilot) [pgs. 61, 66] | 36. Romantic Lead has multiple jobs (bartender, writer) [0:15] |
| 37. The same taxi driver continues to show up throughout Lead's journey. [pgs. 7, 61, 95] | 37. The same taxi driver continues to show up throughout Lead's journey. [0:22; 1:09] |
| 38. Lead gets a ride on a helicopter so that she can get to her destination just in time and save the day. [pg. 66] | 38. Lead gets a ride on a helicopter so that she can get to her destination just in time and save the day. [1:22] |
| 39. Lead chooses to proudly go public with her tattered inappropriate outfit and matted hair from the night before, when she could have covered it up. [pg. 94] | 39. Lead chooses to proudly go public with her tattered inappropriate outfit and matted hair from the night before, when she could have covered it up. [1:24] |
| 40. Lead makes it to her important destination and almost catches a break in avoiding revealing her embarrassing story of the last evening and day, but forcefully and publicly reveals the embarrassing truth. [pgs. 95-105] | 40. Lead makes it to her important destination and almost catches a break in avoiding revealing her embarrassing story of the last evening and day, but forcefully and publicly reveals the embarrassing truth. [1:24-27] |
| 41. Lead's big reveal cuts to several close friends who have helped her along the way (best friends Lori and | 41. Lead's big reveal cuts to several close friends who have helped her along the way (best friends Rose |

| | |
|---|---|
| Deena, bride's parents, Aunt Bertha, etc.) [pgs. 96-99] | and Denise, Pookie, Skrilla and gang, etc.) [1:24-27] |
| 42. Lead and Romantic Lead end up together, despite Lead's embarrassing public reveal. [pg. 107] | 42. Lead and Romantic Lead end up together, despite Lead's embarrassing public reveal. [1:29] |

47.    The ideas contained in the Screenplay have value, the amount of which PLAINTIFF is informed and believes exceeds the jurisdictional limits of this Court.

48.    PLAINTIFF is informed and believes and on that basis alleges that DEFENDANTS breached the foregoing implied-in-fact contract to PLAINTIFF's detriment by exploiting the Screenplay to the exclusion of PLAINTIFF.

49.    By reason of DEFENDANTS' breach of the aforementioned implied-in-fact contract, PLAINTIFF has sustained and will continue to sustain substantial injury, entitling PLAINTIFF to an award of compensatory damages in an amount to be determined but believed to equal or exceed $500,000.

///
///
///
///
///
///
///
///
///

### PRAYER FOR RELIEF

**WHEREFORE**, PLAINTIFF prays for judgment against the DEFENDANTS as follows:

### ON THE FIRST CLAIM FOR RELIEF

1. That the Court find that DEFENDANTS have infringed PLAINTIFF's copyrights in the Screenplay.

2. That the Court find a substantial likelihood that DEFENDANTS will continue to infringe PLAINTIFF's copyrights in the Screenplay unless enjoined from doing so.

3. That DEFENDANTS, their directors and officers, agents, servants, employees, and all other persons in active concert or privity or in participation with them, be enjoined from directly or indirectly infringing PLAINTIFF's copyrights in the Screenplay or continuing to market, offer, sell, dispose of, license, lease, transfer, display, advertise, reproduce, develop or manufacture any works derived or copied from the Screenplay or to participate or assist in any such activity.

4. That DEFENDANTS, their directors and officers, agents, servants, employees, and all other persons in active concert or privity or in participation with them, be enjoined to return to PLAINTIFF any and all originals, copies, facsimiles, or duplicates of the Screenplay in their possession, custody or control.

5. That DEFENDANTS, their directors and officers, agents, servants, employees, and all other persons in active concert or privity or in participation with them, be enjoined to recall from all distributors, wholesalers, jobbers, dealers, retailers, and distributors, and all others known to DEFENDANTS, any originals, copies, facsimiles, or duplicates of any works shown by the evidence to infringe any copyright in the Screenplay.

6.      That DEFENDANTS be enjoined to deliver upon oath, to be impounded during the pendency of this action and destroyed pursuant to judgment herein, all originals, copies, facsimiles, or duplicates of any work shown by the evidence to infringe any copyright in the Screenplay.

7.      That DEFENDANTS be required to file with the Court and to serve on PLAINTIFF, within 30 days after service of the Court's order as herein prayed, a report in writing under oath setting forth in detail the manner and form in which DEFENDANTS have complied with the Court's order.

8.      That at Plaintiff's election, if so made, judgment be entered for PLAINTIFF and against DEFENDANTS for PLAINTIFF's actual damages according to proof, and for any profits attributable to infringements of PLAINTIFF'S copyrights, in accordance with proof.

9.      That at Plaintiff's election, if so made, judgment be entered for PLAINTIFF and against DEFENDANTS for statutory damages based upon DEFENDANTS' acts of infringement, pursuant to the Copyright Act of 1976, 17 U.S.C. §§ 101, *et seq*.

10.     That DEFENDANTS be required to account for all gains, profits, and advantages derived from its acts of infringement and for their other violations of law.

11.     That all gains, profits and advantages derived by DEFENDANTS from their acts of infringement and other violations of law be deemed to be held in constructive trust for the benefit of PLAINTIFF.

12.     That PLAINTIFF have judgment against DEFENDANTS for PLAINTIFF's costs and attorneys' fees.

13.     That the Court grant such other, further, and different relief as the Court deems proper under the circumstances.

## ON THE SECOND CLAIM FOR RELIEF

14.    For  contractual damages in an amount to be determined but equal to or exceeding $500,000.

15.    For costs of suit herein incurred.

16.    For such other and further relief as the Court may deem just and proper.

Dated:  May 7, 2014                                      COSTA ABRAMS & COATE LLP

By:
Charles M. Coate
Theresa E. Johnson
Attorneys for Plaintiff SHAME ON
YOU PRODUCTIONS, INC., a
California corporation

## DEMAND FOR JURY TRIAL

PLAINTIFF hereby demands trial by jury on all issues triable by jury.

Dated: May 7, 2014

COSTA ABRAMS & COATE LLP

By: _____

Charles M. Coate
Theresa E. Johnson
Attorneys for Plaintiff SHAME ON
YOU PRODUCTIONS, INC., a
California corporation



## Receipt

Copyright Office
Library of Congress
101 Independence Avenue SE
Washington, DC 20559-6000



**No.   1-MAVW0G**

**Date:  4/9/2014 11:02:21 AM**

### Received

| | | |
|---|---|---|
| Form(s): | 1 - Form PA | ☐ Search Report |
| Deposit Count: | 1 | ☐ Search |
| Piece Count: | 1 | ☐ Retrieval |
| Type of Deposit: | printed material | ☐ Correspondence |
| Other Enclosures: | | ☐ Inspection |
| Title: | **DARICI'S WALK OF SHAME** | ☐ Photocopies |
| # of Additional Titles: | | ☐ Additional Certificate |
| Priority: | | ☐ Certification |
| # Of Documents: | | ☐ Secure Test Exam |
| | | Other: |

**Received From: Charles M. Coate**            Phone:  **(310) 576-6161**
                 **1221 Second Street, 3rd FL**

                 **Santa Monica, CA 90401-1181**

Representing:                                   Phone:

**Corresponding Id:**

| Fees | | Method of Payment | Amount |
|---|---|---|---|
| No Fee: | ☐ | Check: | 1 @ $65 - check #2553 |
| Fee to be Determined: | ☐ | Money Order: | |
| Base Fee: | $65.00 | Deposit Account: | |
| Special Handling Fee: | $ | Deposit Account Name: | |
| Secure Test Exam Fee: | $ | | |
| Total Due: | $65.00 | | |

                                    **Total Payment:   $65.00**

### Notes

                              Received By:    **YDOOLEY**

Receipt of material is merely a preliminary step in the registration and/or recordation process.  It does not imply that any final determination has been made in the case, or that the material is acceptable for registration.

Official action on an application for copyright registration or a document for recordation can be taken only after there has been a full examination of the claim following regular Copyright Office procedures.  We are glad to discuss questions involving copyright registration on the telephone or in person-to-person conversations.  However, all statements made during these exploratory discussions must be considered provisional, and are not binding either upon the applicant or upon the Office.

This receipt acknowledges delivery of the material to the Copyright Office on the date indicated. When multiple claims are submitted by or on behalf of the same remitter, however, only one receipt will be provided.  If you are submitting multiple claims, only one title will appear on the receipt.

Exhibit "1"



**Receipt**
Copyright Office
Library of Congress
101 Independence Avenue SE
Washington, DC 20559-6000

**No.    1-MAVW0J**

**Date: 4/9/2014 11:07:45 AM**

---

**Received**

| | |
|---|---|
| Form(s): | **1 - Form PA** |
| Deposit Count: | **1** |
| Piece Count: | **1** |
| Type of Deposit: | **printed material** |
| Other Enclosures: | |
| Title: | **DARCI'S WALK OF SHAME** |
| # of Additional Titles: | |
| Priority: | |
| # Of Documents: | |

☐ Search Report
☐ Search
☐ Retrieval
☐ Correspondence
☐ Inspection
☐ Photocopies
☐ Additional Certificate
☐ Certification
☐ Secure Test Exam
Other:

---

**Received From: Charles M. Coate**          Phone:  **(310) 576-6161**
            **1221 Second Street, 3rd FL**

            **Santa Monica, CA 90401-1181**

**Representing:**                              Phone:

**Corresponding Id:**

---

**Fees**

| | | **Method of Payment** | **Amount** |
|---|---|---|---|
| No Fee: | ☐ | Check: | 1 @ $65 - check #2554 |
| Fee to be Determined: | ☐ | Money Order: | |
| Base Fee: | **$65.00** | Deposit Account: | |
| Special Handling Fee: | **$** | Deposit Account Name: | |
| Secure Test Exam Fee: | **$** | | |
| Total Due: | **$65.00** | | |

                              **Total Payment:   $65.00**

---

**Notes**
Changed version

                              Received By:   **YDOOLEY**

---

Receipt of material is merely a preliminary step in the registration and/or recordation process.  It does not imply that any final determination has been made in the case, or that the material is acceptable for registration.

Official action on an application for copyright registration or a document for recordation can be taken only after there has been a full examination of the claim following regular Copyright Office procedures.  We are glad to discuss questions involving copyright registration on the telephone or in person-to-person conversations.  However, all statements made during these exploratory discussions must be considered provisional, and are not binding either upon the applicant or upon the Office.

This receipt acknowledges delivery of the material to the Copyright Office on the date indicated.  When multiple claims are submitted by or on behalf of the same remitter, however, only one receipt will be provided.  If you are submitting multiple claims, only one title will appear on the receipt.



**Receipt**
Copyright Office
Library of Congress
101 Independence Avenue SE
Washington, DC 20559-6000

**No.   1-MAVW0D**

**Date:  4/9/2014 10:57:24 AM**

---

**Received**

| | | |
|---|---|---|
| Form(s): | **2 - DCS** | ☐ Search Report |
| Deposit Count: | | ☐ Search |
| Piece Count: | | ☐ Retrieval |
| Type of Deposit: | | ☐ Correspondence |
| Other Enclosures: | | ☐ Inspection |
| Title: | **DARCI'S WALK OF SHAME** | ☐ Photocopies |
| # of Additional Titles: | | ☐ Additional Certificate |
| Priority: | | ☐ Certification |
| # Of Documents: | **1** | ☐ Secure Test Exam |
| | | Other: |

---

**Received From: Charles M. Coate**                    Phone:  **(310) 576-6161**
                 **1221 Second Street, 3rd FL**

                 **Santa Monica, CA 90401-1181**

**Representing:**                                       Phone:

**Corresponding Id:**

| Fees | | Method of Payment | Amount |
|---|---|---|---|
| No Fee: | ☐ | Check: | 1 @ $105 - check #2555 |
| Fee to be Determined: | ☐ | Money Order: | |
| Base Fee: | $105.00 | Deposit Account: | |
| Special Handling Fee: | $ | Deposit Account Name: | |
| Secure Test Exam Fee: | $ | | |
| Total Due: | $105.00 | | |

**Total Payment:**  **$105.00**

**Notes**

**Received By:    YDOOLEY**

---

Receipt of material is merely a preliminary step in the registration and/or recordation process.  It does not imply that any final determination has been made in the case, or that the material is acceptable for registration.

Official action on an application for copyright registration or a document for recordation can be taken only after there has been a full examination of the claim following regular Copyright Office procedures.  We are glad to discuss questions involving copyright registration on the telephone or in person-to-person conversations.  However, all statements made during these exploratory discussions must be considered provisional, and are not binding either upon the applicant or upon the Office.

This receipt acknowledges delivery of the material to the Copyright Office on the date indicated. When multiple claims are submitted by or on behalf of the same remitter, however, only one receipt will be provided.  If you are submitting multiple claims, only one title will appear on the receipt.

Exhibit "2"

## costa abrams & coate llp | trial & transactional attorneys

1221 Second Street, Third Floor, Santa Monica, California 90401
tel 310.576.6161 fax 310.576.6160
A limited liability partnership including professional corporations

April 18, 2014

Elizabeth Banks
c/o P.J. Shapiro, Esq.
Ziffren, Brittenham, et al.
1801 Century Park W.
Los Angeles, CA 90067
Fax: (310) 553-7068

Elizabeth Banks
c/o Billy Lazarus
United Talent Agency
UTA Plaza
9336 Civic Center Drive
Beverly Hills, CA 90210
Fax: (310) 247-1111
Email: info@unitedtalent.com

Elizabeth Banks
c/o Alissa Vradenburg
Untitled Entertainment
350 S. Beverly Dr., Ste. 200
Beverly Hills, CA 90212
Fax: (310) 601-2344

Elizabeth Banks
Max Handleman
P.O. Box 571690
Tarzana, CA 91357

Elizabeth Banks
Max Handleman
P.O. Box 1348
Studio City, CA 91614

Elizabeth Banks
Max Handleman
11635 Canton Pl.
Studio City, CA 91604

Elizabeth Banks
Max Handleman
c/o Brownstone Productions
3901 Hilton Head Way
Tarzana, CA 91356

Steve Brill
9538 Lania Ln.
Beverly Hills, CA 90210

Steve Brill
2029 Century Park E.
Ste. 1500
Los Angeles, CA 90067

Focus World, Inc.
c/o Tomas J. Kim
5929 Sunrise Mall
Citrus Heights, CA 95610

Focus World, Inc.
100 Universal City Plaza
Universal City, CA 91608

Sidney Kimmel
Entertainment, LLC
c/o James Tauber
9460 Wilshire Blvd. Ste. 500
Beverly Hills, CA 90212
Fax: (310) 777-8892
Email: reception@skefilms.com

FilmDistrict Pictures, LLC
c/o Beth Lemberger
1540 Second St., Ste. 200
Santa Monica, CA 90401
Fax: (310) 315-1723
Email: contact@filmdistrict.com

Lakeshore Entertainment
Corp.
9268 West Third St.
Beverly Hills, CA 90210
Tel.: (310) 867-8000
Fax: (310) 300 3015
Email:
info@lakeshoreentertainment.com

Lakeshore Entertainment
Group, LLC
c/o Eric Reid
9268 West Third St.
Beverly Hills, CA 90210
Tel.: (310) 867-8000
Fax: (310) 300 3015
Email:
info@lakeshoreentertainment.com

Re:     "Darci's Walk of Shame"/"Walk of Shame"

Gentlepersons:

     This office has been retained to represent the interests of Shame On You Productions, Inc., the owner by way of a valid assignment of all rights, including those under copyright and

Exhibit "3"

contract, to an original motion picture screenplay entitled "Darci's Walk of Shame" (the "Screenplay," also sometimes referred to herein as the "Project") written by Dan Rosen.

It is our understanding that on or about July 31, 2007, Mr. Rosen forwarded by email a draft of the Screenplay to an actor who was a mutual acquaintance of actress and producer Elizabeth Banks and who had suggested to Mr. Rosen that Ms. Banks should be considered to play the lead character of "Darci." We understand that Mr. Rosen agreed and communicated that he too was interested in Ms. Banks playing the role, and authorized the mutual acquaintance to forward a draft of the Screenplay to Ms. Banks and/or set up a meeting with Ms. Banks specifically to seek her involvement acting in and/or developing a motion picture based on such Screenplay.

Consequently, it is our understanding that approximately a week later a meeting was set up through the mutual acquaintance on or about August 5, 2007, wherein Mr. Rosen met in person with actress and producer Elizabeth Banks, her husband and producing partner Max Handleman, and the mutual acquaintance at the restaurant Mexicali, located at 12161 Ventura Blvd, Studio City, California 91604, in order to discuss the Project. We understand the meeting lasted approximately three (3) hours, wherein Mr. Rosen extensively discussed the Screenplay, including the plot, story, characters, sequence of events, themes, and incidents portrayed in such fictional work. We are informed that Mr. Rosen brought another draft of the Screenplay and submitted it in person to Ms. Banks and Mr. Handleman. It is our understanding that a further purpose of the meeting and submission to Ms. Banks and Mr. Handleman was to seek their interest in developing and/or purchasing the Screenplay, *inter alia*. We believe that both Ms. Banks and Mr. Handleman were aware of Mr. Rosen's expertise and involvement in the film business as a producer, screenwriter, and director at the time of the meeting.

We are informed that Ms. Banks and Mr. Handleman expressed their interest in the Project at the meeting, and communicated to Mr. Rosen that they liked the Screenplay and would get back to him soon after reading the copy of the Screenplay submitted to them on or about August 5, 2007. It is our understanding that at the time the material was presented to them, they were aware of the fact and agreed that the Screenplay had been presented to them with a clear understanding that if ideas and elements of the Screenplay were to be used by them, they must first obtain rights in and to the Screenplay in exchange for appropriate compensation to be agreed upon in accordance with entertainment industry custom and practice.

Contrary to their representations, we understand that neither Ms. Banks nor Mr. Handleman ever got back to Mr. Rosen about the Screenplay. Although we believe Mr. Rosen attempted reaching out to Mr. Handleman by email the day after the meeting and once again several days later, Mr. Handleman ignored such efforts and there were no further communications from Ms. Banks or Mr. Handleman to Mr. Rosen regarding the Project. However, we understand that neither Ms. Banks nor Mr. Handleman ever passed on the Project, and instead retained their copy and/or copies of the Screenplay, and never returned any version of it.

2

Years later following the above referenced lunch at Mexicali, on or about January 15, 2014, an article appeared in *Deadline Hollywood* announcing that Ms. Banks was starring in a motion picture entitled "Walk of Shame," and included a first trailer for the Film. The article announced that Steve Brill had written and directed the film, that Focus World was the distributor, and that a final release date had been set for April 25, 2014.

A recent review of the Internet Movie Database ("IMDB") webpage for the film "Walk of Shame," the promotional movie poster found therein and further investigation confirms that Elizabeth Banks stars in the Film; that Steven Brill is the director and writer; that Sidney Kimmel Entertainment, Film District, and Lakeshore Entertainment are the production companies; that Focus World is the US distributor; and that the Film is now set for release on May 2, 2014 in the United States.

There is little question, that subsequent to our investigation and after reviewing the trailers and press releases associated with the more recent work "Walk of Shame," that such work appears to borrow heavily from the Screenplay. The stories, characters, sequence of events, themes, and incidents portrayed in both fictional works appear virtually identical. These substantially if not strikingly similar elements, coupled with direct access by Ms. Banks and Mr. Handleman to the Screenplay, suggest that there is little doubt that numerous substantive elements of "Walk of Shame" are copied from the Screenplay submitted to them in or about August of 2007.

Under the circumstances we request that all drafts of the subject screenplay, development notes, electronic notes or email communications regarding the same be maintained and not destroyed. It goes without saying that in the event that such materials are destroyed following your receipt of this letter that an adverse inference will be drawn in the future. Correspondingly, we request that you immediately provide this office with all copies of all of the above materials in the event that you wish to rebut the conclusion that such misappropriation has occurred without formal litigation. We will agree to hold such materials in confidence to facilitate an expedited review if it is your contention that notwithstanding the above "Walk of Shame" was wholly independently created.

Alternatively, if it is conceded that "Walk of Shame" has copied the Screenplay and may well represent an infringement of rights under copyright and/or a breach of implied contract, we are open to a prompt dialogue with each of you or your representatives to explore a prompt, expeditious and confidential resolution of this matter without the necessity of legal action, which given the foregoing will likely garner significant media scrutiny. Finally, regardless of whether the matter can be immediately resolved informally at this juncture, we strongly advise you to put any errors and omissions insurance carrier on notice of this claim as the failure to do so could well abrogate such coverage in the absence of such prompt notice.

3

This letter is not intended as a full statement of the rights or remedies of our client, nor of the facts or parties involved in this matter.  Nothing contained herein shall be deemed to be a waiver of or a release of any right or claim which our client may have against you or your successors, arising out of this matter.  We look forward to hearing from you without delay.

Regards,

Charles M. Coate

4

```
┌─────────────────────────┐
│    BROADCAST REPORT      │
└─────────────────────────┘
```

```
TIME  : 04/18/2014 16:17
NAME  : CAC
FAX   : 1
TEL   : 3105766160
SER.# : 000C2V538104
```

| PAGE(S) | 05 |
|---------|----|

| DATE | TIME | FAX NO./NAME | DURATION | PAGE(S) | RESULT | COMMENT |
|------|------|--------------|----------|---------|--------|---------|
| 04/18 | 16:08 | 13105537068 | 56 | 05 | OK | ECM |
| 04/18 | 16:09 | 13102471111 | 01:11 | 05 | OK | ECM |
| 04/18 | 16:11 | 13106012344 | 01:41 | 05 | OK | ECM |
| 04/18 | 16:13 | 13107778892 | 56 | 05 | OK | ECM |
| 04/18 | 16:15 | 13103151723 | 59 | 05 | OK | ECM |
| 04/18 | 16:17 | 13103003015 | 48 | 05 | OK | ECM |

```
BUSY: BUSY/NO RESPONSE
NG  : POOR LINE CONDITION
CV  : COVERPAGE
PC  : PC-FAX
```

```
┌─────────────────────────────────────────────┐
│   TRANSMISSION VERIFICATION REPORT           │
└─────────────────────────────────────────────┘
                            TIME  : 04/22/2014 14:31
                            NAME  : CAC
                            FAX   : 1
                            TEL   : 3105766160
                            SER.# : 000C2V538104
```

```
┌───────────────────────────────────────────────────────────────┐
│  DATE,TIME          04/22  14:29                                │
│  FAX NO./NAME       13102471111                                 │
│  DURATION           00:01:35                                    │
│  PAGE(S)            05                                          │
│  RESULT             OK                                          │
│  MODE               STANDARD                                    │
│                     ECM                                         │
└───────────────────────────────────────────────────────────────┘
```

# costa abrams & coate llp | trial & transactional attorneys

1221 Second Street, Third Floor, Santa Monica, California 90401
tel 310.576.6161   fax 310.576.6160
A limited liability partnership including professional corporations

# FAX

|  |  |  |  |
|---|---|---|---|
| To: | Steven Brill c/o United Talent Agency<br>Attn: Blair Kohan<br>Attn: Allan Haldeman | From: | Roxana Lonergan<br>*Costa Abrams & Coate LLP* |
| Fax: | (310) 247-1111 | Pages: | 6 (including cover sheet) |
| Phone: |  | Date: | April 22, 2014 |
| Re: | **"Darci's Walk of Shame"/"Walk of Shame"** | Cc: |  |

☐ **Urgent**      ☐ **For Review**      ☐ **Please Comment**      ☐ **Please Reply**      ☐ **Please Recycle**

Please find attached correspondence dated April 18, 2014, which was previously faxed to UTA but is now being forwarded to the attention of Ms. Kohan and Mr. Haldeman on behalf of Steven Brill as we have just learned of your representation.

-48

**costa abrams & coate llp** | trial & transactional attorneys

1221 Second Street, Third Floor, Santa Monica, California 90401
tel 310.576.6161 fax 310.576.6160
A limited liability partnership including professional corporations

April 25, 2014

Elizabeth Banks
c/o P.J. Shapiro, Esq.
Ziffren, Brittenham, et al.
1801 Century Park W.
Los Angeles, CA 90067
Fax: (310) 553-7068

Elizabeth Banks
c/o Billy Lazarus
United Talent Agency
UTA Plaza
9336 Civic Center Drive
Beverly Hills, CA 90210
Fax: (310) 247-1111
Email: lazarusb@unitedtalent.com

Elizabeth Banks
c/o Alissa Vradenburg
Untitled Entertainment
350 S. Beverly Dr., Ste. 200
Beverly Hills, CA 90212
Fax: (310) 601-2344

Elizabeth Banks
Max Handleman
P.O. Box 571690
Tarzana, CA 91357

Elizabeth Banks
Max Handleman
P.O. Box 1348
Studio City, CA 91614

Elizabeth Banks
Max Handleman
11635 Canton Pl.
Studio City, CA 91604

Elizabeth Banks
Max Handleman
c/o Brownstone Productions
3901 Hilton Head Way
Tarzana, CA 91356

Steven Brill
c/o Blair Kohan
United Talent Agency
UTA Plaza
9336 Civic Center Drive
Beverly Hills, CA 90210
Fax: (310) 247-1111
Email: kohanb@unitedtalent.com

Steven Brill
c/o Allan Haldeman
United Talent Agency
UTA Plaza
9336 Civic Center Drive
Beverly Hills, CA 90210
Fax: (310) 247-1111
Email: haldemana@unitedtalent.com

Steven Brill
9538 Lania Ln.
Beverly Hills, CA 90210

Steven Brill
2029 Century Park E.
Ste. 1500
Los Angeles, CA 90067

Focus World, Inc.
c/o Tomas J. Kim
5929 Sunrise Mall
Citrus Heights, CA 95610

Focus World, Inc.
100 Universal City Plaza
Universal City, CA 91608

Sidney Kimmel
Entertainment, LLC
c/o James Tauber
9460 Wilshire Blvd. Ste. 500
Beverly Hills, CA 90212
Fax: (310) 777-8892
Email: reception@skefilms.com

FilmDistrict Pictures, LLC
c/o Beth Lemberger
1540 Second St., Ste. 200
Santa Monica, CA 90401
Fax: (310) 315-1723
Email: contact@filmdistrict.com

Lakeshore Entertainment
Corp.
Attn: Robert Benun, Esq.
9268 West Third St.
Beverly Hills, CA 90210
Tel.: (310) 867-8000
Fax: (310) 300-3015
Email:
RBenun@LakeshoreEntertainment.com

Lakeshore Entertainment
Group, LLC
c/o Eric Reid
9268 West Third St.
Beverly Hills, CA 90210
Tel.: (310) 867-8000
Fax: (310) 300-3015
Email:
info@lakeshoreentertainment.com

Re:   "Darci's Walk of Shame"/"Walk of Shame"

Gentlepersons:

By letter dated April 18, 2014, we wrote concerning the motion picture production entitled "Walk of Shame." We advised that "Walk of Shame" appears to be a clear infringement

of a screenplay entitled "Darci's Walk of Shame" (the "Screenplay" or "Project") written by Dan Rosen, to which all rights are now owned by Shame On You Productions, Inc.

As explained in the letter (attached again hereto for ease of reference), it is our understanding that on or about July 31, 2007 Mr. Rosen forwarded a draft the Screenplay to a mutual acquaintance who suggested that Elizabeth Banks play the lead role of "Darci" and authorized him to forward the same and/or set up a meeting with Ms. Banks; a meeting was subsequently set up in person the following week between Mr. Rosen, Ms. Banks, her husband Max Handleman and the mutual acquaintance to seek their interest in developing and/or purchasing the Screenplay, *inter alia*; Mr. Rosen extensively discussed the Screenplay and provided Ms. Banks and Mr. Handleman with another copy thereof at the meeting; and although they expressed their interest in the Project at the meeting Ms. Banks and Mr. Handleman never got back to Mr. Rosen nor officially passed on the Project, retaining their copy thereof. After becoming aware in 2014 of the upcoming release for the film "Walk of Shame" starring Ms. Banks and subsequent to our investigation and review of the trailers and press releases associated therewith, there is little question that such work borrows heavily from the "Darci's Walk of Shame" Screenplay.

Although we have heard from counsel for Lakeshore Entertainment in response to our April 18, 2014 letter, none of the records requested therein have been furnished to our office nor has there been an indication of any agreement to furnish them. However, it was represented during our conversation that the Steven Brill "Walk of Shame" screenplay used for the film was written years after Mr. Rosen's Screenplay was written, which in no way clarifies matters.

We note the absence of any written response denying the uncanny similarities in both works and infer that you too believe the facts to be as we believe them to be. The "Walk of Shame" work is a willful infringement of the copyrighted Screenplay "Darci's Walk of Shame." Similarly, the ideas of "Darci's Walk of Shame" have been exploited in breach of implied in fact contract rights held by Shame On You Productions, Inc.

Accordingly, the refusal to address this matter leaves us little alternative but to advise you that in the event we do not immediately receive the requested records, we will be forced to consider commencement of appropriate proceedings to seek such materials in discovery as well as any and all available remedies, both legal and equitable, under the circumstances. We look forward to your prompt response.

Regards,

Charles M. Coate

Enclosures

2

BROADCAST REPORT

```
TIME  : 04/25/2014 12:34
NAME  : CAC
FAX   : 1
TEL   : 3105766160
SER.# : 000C2V538104
```

| PAGE(S) | 09 |
|---------|----|

| DATE | TIME | FAX NO./NAME | DURATION | PAGE(S) | RESULT | COMMENT |
|------|------|-------------|----------|---------|--------|---------|
| 04/25 | 12:19 | 13105537068 | 01:52 | 09 | OK | ECM |
| 04/25 | 12:21 | 13102471111 | 02:18 | 09 | OK | ECM |
| 04/25 | 12:24 | 13106012344 | 03:08 | 09 | OK | ECM |
| 04/25 | 12:28 | 13107778892 | 01:40 | 09 | OK | ECM |
| 04/25 | 12:30 | 13103151723 | 01:43 | 09 | OK | ECM |
| 04/25 | 12:32 | 13103003015 | 01:28 | 09 | OK | ECM |

```
BUSY: BUSY/NO RESPONSE
NG  : POOR LINE CONDITION
CV  : COVERPAGE
PC  : PC-FAX
```

# costa abrams & coate llp | trial & transactional attorneys

1221 Second Street, Third Floor, Santa Monica, California 90401
tel 310.576.6161 fax 310.576.6160
A limited liability partnership including professional corporations

April 30, 2014

Robert L. Benun, Esq.
Lakeshore Entertainment
9266 West Third Street
Beverly Hills, CA 90210

   Re: <u>"Darci's Walk of Shame"/"Walk of Shame"</u>

Dear Mr. Benun:

   We are in receipt of your April 28, 2014 letter in response to our letters dated April 18 and 25, 2014. As requested therein, please find attached the November 17, 2006 WGA Certificate of Registration for the "Darci's Walk of Shame" screenplay. As for your request for a copy of our client's script, we have yet to receive any copy of Mr. Brill's "Walk of Shame" script as requested a number of times nor do we believe a unilateral exchange of our client's materials would be appropriate at this time. It is noted however that "Darci's Walk of Shame" was sent out for consideration to various production companies and talent agencies during the relevant timeframe, long before 2011-2012.

   With respect to the remainder of your letter, particularly that your "independent development history [confirmed by Mr. Brill] effectively refutes" our client's claims of infringement and breach of implied-in-fact contract, suffice it to say that we disagree entirely. Additionally, there are attempts to ascribe certain acknowledgments to our client and/or our office that are inaccurate, perhaps intentionally so. Moreover, Lakeshore Entertainment's refusal to produce the requested documentation supporting its position, and the utter failure of any other party to whom we addressed our prior letters to respond thereto, speaks volumes. Unfortunately, it now appears we are left with little other option but to prepare initiation of appropriate proceedings to obtain necessary and relevant materials in discovery as well as any and all available remedies, both legal and equitable, under the circumstances. In closing, this letter is not intended as a full statement of the rights or remedies of our client, nor as a waiver of or a release of any right or claim which our client may have arising out of this matter.

        Regards,

        Charles M. Coate

Enclosure



WRITERS GUILD OF AMERICA, EAST

# CERTIFICATE OF REGISTRATION

The Writers Guild of America, East, Inc. issues this certificate to:

Daniel I Rosen

for the material titled:
Darci's Walk of Shame

Registration Number:   145107
Date Registered:   November 17, 2006
Expiration Date:   November 17, 2016