**BARNES & THORNBURG LLP**
Stephen R. Mick, Bar No. 131569
stephen.mick@btlaw.com
Devin J. Stone, Bar No. 260326
devin.stone@btlaw.com
2029 Century Park East, Suite 300
Los Angeles, California 90067
Telephone: (310) 284-3880
Facsimile: (310) 284-3894

Attorneys for Defendants
LAKESHORE ENTERTAINMENT
GROUP LLC, LAKESHORE
ENTERTAINMENT CORP.,
FILMDISTRICT PICTURES, LLC, FOCUS
FEATURES, LLC, SIDNEY KIMMEL
ENTERTAINMENT, LLC, BRILLCO,
INC., STEVEN BRILL, ELIZABETH
BANKS, and MAX HANDELMAN

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | |
|---|---|
| SHAME ON YOU PRODUCTIONS, INC.,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>ELIZABETH BANKS, an individual; MAX HANDELMAN, an individual, STEVEN BRILL, an individual, BRILLCO, INC., a California corporation, FOCUS WORLD, INC., a California corporation; SIDNEY KIMMEL ENTERTAINMENT, LLC, a California limited liability company; FILMDISTRICT PICTURES, LLC, a Delaware limited liability company; LAKESHORE ENTERTAINMENT CORP., a Delaware corporation; LAKESHORE ENTERTAINMENT GROUP LLC, a California limited liability company; and Does 1-10, inclusive,<br><br>　　　　　Defendants. | Case No.: 2:14-cv-03512 MMM (JCx)<br><br>**LAKESHORE ENTERTAINMENT LLC'S NOTICE OF MOTION AND MOTION FOR JUDGMENT ON THE PLEADINGS**<br><br>[Fed. R. Civ. P. 12(c)]<br><br>Date:　May 18, 2015<br>Time:　10:00 a.m.<br>Place:　Courtroom 780<br><br>*[Assigned to Hon. Margaret M. Morrow]* |

1

# TABLE OF CONTENTS

I.   INTRODUCTION ...................................................................................1

II.  FACTUAL BACKGROUND..................................................................2
     A.  The Allegations in the Complaint ...............................................2
     B.  Summary of the Works at Issue ...................................................3
         1.  WOS ................................................................................3
         2.  Darci's .............................................................................4

III. PLAINTIFF'S COPYRIGHT CLAIM SHOULD BE DISMISSED
     BECAUSE NO REASONABLE PERSON COULD FIND
     SUBSTANTIAL SIMILARITY OF PROTECTED EXPRESSION...............5
     A.  Legal Standard for Determining a Motion to Dismiss in a Copyright
         Infringement Action. ....................................................................5
     B.  The Two Works Are Incorporated By Reference in the Complaint..........6
     C.  The Ninth Circuit's Extrinsic Test Requires the Court to Compare the
         Detailed Elements of the Works, After Filtering Out Unprotected
         Elements, Such as General Story Ideas and Scenes a Faire.................7

IV.  WOS IS NOT SUBSTANTIALLY SIMILAR TO DARCI'S AS A MATTER
     OF LAW .................................................................................................8
     A.  Plot and Sequence of Events........................................................8
         1.  The Plot of WOS is Vastly Different from Darci's ........................9
             a.  Friends Sub-Plot............................................................11
             b.  Meghan's Struggles Continue ........................................12
             c.  Friends Reunite at the Tow Yard ....................................13
         2.  Darci's Is a Completely Different Story................................14
         3.  Plaintiff Points to No Protectable Expression .........................17
     B.  Characters ...............................................................................18
         1.  The Main Characters Are Completely Different.........................18
         2.  The Male Love Interests Are Both Very Different and Serve
             Different Purposes. .......................................................19
         3.  The Remaining Bit Characters Share No Similarities ...............20
     C.  Setting ....................................................................................21
     D.  Mood ......................................................................................22
     E.  Dialogue .................................................................................23
     F.  Pace.......................................................................................24

V.   CONCLUSION .....................................................................................24

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Benay v. Warner Brothers Entertainment*, 607 F.3d 620 (9th Cir. 2010) ..............................19

*Berkic v. Crichton*, 761 F.2d 1289 (9th Cir. 1985) ................................................1, 19, 22

*Berkla v. Corel Corp.*, 66 F. Supp. 2d 1129 (E.D. Cal. 1999) ........................................3

*Branch v. Tunnell*, 14 F.3d 449 (9th Cir. 1994) (in ruling on Rule 12(b)(6) ........................7

*Campbell v. Walt Disney Co.*, 718 F. Supp. 2d 1108 (N.D. Cal. 2010) ................................6

*Capcom Co., Ltd. v. MKR Grp., Inc.*, 2008 WL 4661479 (N.D. Cal. Oct. 20, 2008) ..........................6

*Cavalier v. Random House, Inc.*, 297 F.3d 815 (9th Cir. 2002) ................................8, 22, 23

*Christianson v. West Public Co.*, 149 F.2d 202 (9th Cir. 1945) ........................................6

*Decorative Aides Corp. v. Staple Sewing Aides Corp.*, 497 F. Supp. 154 (S.D.N.Y. 1980) ................3

*Dr. Seuss Enterprise, L.P. v. Penguin Books USA*, 109 F.3d 1394 (9th Cir. 1997) ................5

*Eldred v. Ashcroft*, 537 U.S. 186 (2003) ........................................................5

*Feist Publics, Inc. v. Rural Telegraph Serv. Co.*, 499 U.S. 340 (1991) ..............................5, 7

*Funky Films, Inc. v. Time Warner Entm't Co., L.P.,* 462 F.3d 1072, 1077 (9th Cir. 2006) .......... 6-9, 19

*Harper & Row Publishers, Inc. v. Nation Enterprise*, 471 U.S. 539 (1985) ........................5

*Hogan v. DC Comics*, 48 F. Supp. 2d 298 (S.D.N.Y. 1999) ........................................22

*Ideal Toy Corp. v. Fab- Lu, Ltd.*, 360 F.2d 1021 (2d Cir. 1966) ..................................3

*Idema v. Dreamworks, Inc.*, 162 F. Supp. 2d 1129 (C.D. Cal. 2001) ..............................3

*Knievel v. ESPN*, 393 F.3d 1068 (9th Cir. 2005) ................................................7

*Kouf v. Walt Disney Pictures & Television*, 16 F.3d 1042 (9th Cir. 1994) ........................8, 19

*Lake v. Columbia Broadcast System*, 140 F. Supp. 707 (S.D. Cal. 1956) ..........................6

*Mallery v. NBC Universal, Inc.*, No. CV-07-2250, 2007 U.S. Dist. LEXIS 88960 (S.D.N.Y. Dec. 3, 2007) ........................................................................6

*Milano v. NBC Universal, Inc.*, 584 F. Supp. 2d 1288 (C.D. Cal. 2008) ..........................19

ii

*Narell v. Freeman*, 872 F.2d 907 (9th Cir.1989) ...................................................................25

*Olson v. National Broadcast, Co.*, 855 F.2d 1446 (9th Cir.1988) ...........................22, 24, 25

*Rice v. Fox Broadcast Co.*, 330 F.3d 1170 (9th Cir. 2003) ...........................................8, 24

*Sid & Marty Krofft Television Prod., Inc. v. McDonald's Corp.*, 562 F.2d 1157 (9th Cir. 1977)...........8

*Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 417 (1984) ...........................................6

*Walker v. Time Life Films,* 784 F.2d 44 ...............................................................................19

*Wild v. NBC Universal, Inc.*, 788 F. Supp. 2d 1083 (C.D. Cal. 2011), *aff'd* 2013 WL 750655 (9th Cir. Feb. 23, 2013) ..............................................................................6, 7, 9, 22, 25

*Universal Dyeing & Printing, Inc. v. U.S. Textile Printing, Inc.*, Number CV 09-09132 DDP VBKx, 2011 WL 5865567 (C.D. Cal. Nov. 21, 2011) ...............................................................3

*Williams v. Crichton*, 84 F.3d 581 (2d Cir. 1996) ...................................................................8

*Zella v. E.W. Scripps Co.*, 529 F. Supp. 2d 1124 (C.D. Cal. 2007)...............1, 6, 7, 8, 9, 22

## FEDERAL STATUTES

Fed. R. Civ. P. Rule 12(c)] .......................................................................................1, 3, 5

Fed. R. Civ. P. Rule 7-3 ...............................................................................................1

Fed. R. Civ. P. Rule 56 ...............................................................................................6

MOTION FOR JUDGMENT ON THE PLEADINGS

**TO PLAINTIFF AND ITS ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on May 18, 2015, at 10:00 a.m., or as soon thereafter as the parties may be heard, before the Honorable Margaret M. Morrow, United States District Judge, in Courtroom 780 of the Edward R. Roybal Federal Building and Courthouse, located at 255 E. Temple Street, Los Angeles, California 90012, defendant Lakeshore Entertainment Group LLC ("Lakeshore" or "Defendant"), will and hereby does move to dismiss the Complaint ("Compl.") of plaintiff Shame on You Productions, Inc. ("Plaintiff") in its entirety, with prejudice, pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

Defendant moves to dismiss the Complaint on the grounds that Plaintiff fails to state a claim upon which relief can be granted and the Complaint cannot be cured by amendment. Specifically, the Complaint asserts a claim for copyright infringement and breach of implied-in-fact contract. Both of these claims should be dismissed because, as a matter of law, there is no substantial similarity between Plaintiff's work and Defendants' allegedly infringing work under Ninth Circuit law, as will be clear when the Court compares the works. The dismissal should be with prejudice, as the contents of the works will not change.

This Motion is made following the conference of counsel pursuant to Local Rule 7-3 on August 14, 2014.

This Motion is based upon this Notice of Motion and the attached Memorandum of Points and Authorities; the pleadings and papers on file in this action; the supporting Declaration of Devin Stone filed concurrently herewith; any other matters of which the Court may take judicial notice; the works lodged by Defendants concurrently herewith; \
\ \ \
\ \ \
\ \ \
\ \ \
\ \ \

1

1  and such other argument that may be presented to this Court at or before the hearing on

2  this Motion.

3  Dated:  February 25, 2015                **BARNES & THORNBURG LLP**

4

5  By:_____ */s/ Devin Stone*_____

6                                 STEPHEN R. MICK
                                   DEVIN STONE
7                                 Attorneys for Defendants
                    Lakeshore Entertainment Group LLC *et al.*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.   INTRODUCTION

In 2006, plaintiff's contractual assignor, Dan Rosen ("Rosen"), allegedly wrote a screenplay for a movie about a fanciful adventure throughout Hawaii entitled *Darci's Walk of Shame* ("*Darci's*").  Rosen assigned his rights in the screenplay to a specially-created company, plaintiff Shame on You Productions, Inc. ("Plaintiff").  Plaintiff waited approximately eight years — until the premier of Defendants' feature film, *Walk of Shame* ("*WOS*") – to file suit.  Plaintiff asserts claims for copyright infringement and breach of implied-in-fact contract, both of which rely on the allegation that *WOS* copies elements from *Darci's*.  Plaintiff's claim should be dismissed because *WOS* and *Darci's* (collectively, the "works") share *only* the generic uncopyrightable idea of a woman who has too much to drink one night and suffers the consequences the next day (commonly known as a "walk of shame").  The works are not "substantially similar" in protected expression as a matter of law under the Ninth Circuit's well-established extrinsic test.

Courts routinely dismiss copyright claims at the pleading stage after comparing the works at issue and finding a lack of substantial similarity between them.  *See, e.g*., *Zella v. E.W. Scripps Co.*, 529 F. Supp. 2d 1124, 1139 (C.D. Cal. 2007).  Here, the lack of similarity is undeniable from a simple comparison of the works.  *WOS* is a light-hearted comedy about a successful news anchor in Los Angeles, who, after having a one night stand must find her way back to her local news agency to audition for her dream job.  *Darci's*, by contrast, is a surreal tale about a woman who is forced to attend her sister's wedding in Maui wearing a hideous bridesmaid's dress, tries and fails to have a one night stand and then proceeds to fall in love with her local cab- driving/helicopter-piloting/firefighting companion.  The creative elements in the two works share little similarities apart from the idea of a zany sequence of events following a night of drinking -- an idea that is not protected by copyright law.  *Berkic v. Crichton*, 761 F.2d 1289, 1293 (9th Cir. 1985) ("General plot ideas are not protected by copyright law").  As the lack of substantial similarity is readily apparent from a simple examination of the

1

1  two works in question, the Court should dismiss Plaintiff's copyright claim without

2  further expenditure of time and resources by the Defendants and this Court.

3  **II.   FACTUAL BACKGROUND**

4        **A.    The Allegations in the Complaint**

5        Defendants are the producers, distributors, authors, writer, director, and actress

6  (and actress's husband) of the major motion picture *WOS*.  (Compl, ¶¶ 4-12.)

7        Plaintiff is a single purpose corporation that is the assignee of the *Darci's*

8  screenplay written by Dan Rosen.  (Compl., ¶ 16).  Plaintiff allegedly registered the

9  *Darci's* screenplay with the U.S. Copyright office in April of 2014.  Plaintiff alleges that

10  eight years ago, Rosen had lunch with defendants Banks and Handelman to discuss the

11  potential for Ms. Banks to act in a movie based on the *Darci's* screenplay.  (Compl., ¶

12  18).  By Plaintiff's own allegations, other than at this supposed lunch at a Mexicali

13  restaurant in 2007, neither Banks nor Handelman expressed any interest in *Darci's* ever

14  again.  (Compl., ¶ 20).  Plaintiff does not allege that defendants Lakeshore

15  Entertainment Group LLC, Lakeshore Entertainment Corp., FilmDistrict Pictures, LLC,

16  Focus Features LLC, Sidney Kimmel Entertainment, LLC, Brillco, Inc., or Steven Brill

17  ever had access to the *Darci's* screenplay.  Plaintiff alleges that "numerous substantive

18  original elements of 'Walk of Shame' are copied from the [*Darci's*] screenplay."

19  (Compl., ¶ 24).  Based on the alleged similarities, Plaintiff asserts one claim for

20  copyright infringement and one claim for breach of an implied-in-fact contract.

21        Plaintiff purposefully did not attach its work to the Complaint.  Because of this,

22  the Court explicitly commanded Plaintiff to provide its screenplay to put the parties on

23  equal footing *back in September*:

24        as part of your initial disclosures, those screenplays have to be exchanged. This is
        not a game of cat and mouse. It's a game of put everything on the table and then
25        let's see where the chips fall. So let's get that done.

26  Yet, Plaintiff refused to provide its screenplay.  Plaintiff thus forced Defendants to

27  move, ex parte, for an order compelling Plaintiff to provide its work.  On December 12,

28  2014, the Court issued its Order Granting Defendants' Ex Parte Application for an Order

2

Directing Plaintiff to Produce its Screenplay and Denying Defendants' Ex Parte Application for an Order Staying Discovery.  For *seven months*, Plaintiff was allowed to push its strategic advantage in refusing to provide its *sin-qua-non*-document – its screenplay.  As the Court pointed out in its order granting defendants' *ex parte* application, Plaintiff admitted why it withheld the screenplay for so long: it sought to prevent defendants from filing a motion for judgment on the pleadings under Rule 12(c).  (Dkt. 42, "Shame on You's suggestion that it is withholding evidence to prevent the filing of a motion is troubling.")  The present motion represents the MJOP that Plaintiff tried to prevent.  As the relevant works are specifically referenced and quoted in the Complaint as being central to Plaintiff's claims, Defendants have properly submitted the works with their motion to dismiss for the Court's comparison.[1]  The works are briefly summarized below.

### B.   <u>Summary of the Works at Issue</u>

      1.   *WOS*

*WOS* is a light-hearted comedy about a successful news anchor in Los Angeles. The lead character, Meghan Miles, is the lead anchor of the local Los Angeles news outfit, KZLA.  She dreams of becoming the national network anchor.  After believing that she has lost her bid to become the network news anchor, her friends convince her to have a night on the town in an alluring yellow cocktail dress.  After having an out-of-character one-night stand, Meghan learns that she is still in the running for the network

---

[1] This Court has already rejected Plaintiff's argument that the case is not susceptible to a motion for judgment on the pleadings:

> Defendants suggest they may bring a motion for judgment on the pleadings based on a lack of substantial similarity.  The fact that interim drafts may reflect story elements that are similar to Shame on You's screenplay and that were later deleted would certainly be demonstrative of access, and perhaps even direct evidence of copying. Neither access nor copying alone suffice to prove copyright infringement, however; the works must also be substantially similar. [citations] Since the motion defendants may file concerns substantial similarity, the interim drafts would not, in and of themselves, serve to defeat the motion.

[Dkt. 42]  Plaintiff's repeated refusal to provide its script shows that Plaintiff sought (and largely succeeded up until this point) to prejudice defendants' rights to speedy resolution, burden this Court, and deny the purpose of Rule 12.

news anchor position and she need only appear for a final news-cast to secure the job. Unfortunately, circumstances conspire against her leading her throughout Los Angeles in her attempt to get back to her news station.  Meghan's adventures carry her to freeway underpasses where she must defend herself from a gang of prostitutes, a drug den in East Los Angeles where she wins over a band of friendly drug dealers, the LA suburbs, and many other locations around Los Angeles.  Eventually she is reunited with her friends, wins the admiration of her network bosses, and learns to be satisfied with herself.  Declaration of Devin Stone ("Stone Decl."), Ex. A and C (the screenplay and DVD of the movie Walk of Shame, respectively).

2. *Darci's*

By contrast *Darci's* is a vulgar romantic comedy about a withered Chicagoan who cannot hold a steady boyfriend and who is forced to attend her sister's wedding in Maui. As the maid of honor at the wedding, Darci is must wear a hideous puffy pink southern belle bridesmaids dress.  When she catches her boyfriend having an affair, Darci decides to attend the wedding at an ultra-romantic resort, alone.  Darci is not happy about it and proceeds to drink herself silly for two days.  After failing to sleep with a waiter at the wedding reception, Darci must walk back to her hotel while dealing with Japanese tourists, local Hawaiians, and the indigenous snakes.  After a snake bite, Darci is rescued by her dream man, Nathan (a down to earth local who drives a taxi, volunteers for the local fire department, and flies a med-evac helicopter).  Nathan challenges Darci's notions about what she wants in a man and she spends the latter half of the script wrestling with her feelings for Nathan.  Ultimately, Darci receives her happy ending as she learns that she was too drunk to have slept with the waiter and Nathan follows Darci back to Chicago for their first kiss.  Stone Decl. Ex. B (Plaintiff's screenplays for Darci's Walk of Shame).

\ \ \

\ \ \

\ \ \

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## III.   PLAINTIFF'S COPYRIGHT CLAIM SHOULD BE DISMISSED BECAUSE NO REASONABLE PERSON COULD FIND SUBSTANTIAL SIMILARITY OF PROTECTED EXPRESSION

### A.   Legal Standard for Motion to Dismiss in a Copyright Infringement Action.

The purpose of copyright protection is "to promote the creation and publication of free expression." *Eldred v. Ashcroft*, 537 U.S. 186, 219 (2003); *see also Feist Pubs., Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 344-45 (1991). "The most fundamental axiom of copyright law is that '[n]o author may copyright his ideas.'" *Id.* at 349. Rather, copyright law distinguishes "between ideas and expression and makes only the latter eligible for copyright protection." *Eldred*, 537 U.S. at 219; *see also Harper & Row Publishers, Inc. v. Nation Enter.*, 471 U.S. 539, 547 (1985) ("The copyright is limited to those aspects of the work termed 'expression' – that display the stamp of the author's originality.").  Moreover, copyright protection is available only where the expression in two works is "substantially similar."  *Dr. Seuss Enter., L.P. v. Penguin Books USA*, 109 F.3d 1394, 1398 (9th Cir. 1997) ("'substantial similarity' refers to similarity of expression, not merely similarity of ideas or concepts").

A court may dismiss a complaint under Rule 12 of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted where there is no similarity of protected expression between the plaintiff's and defendant's works. Indeed, for more than 60 years, courts in the Ninth Circuit have dismissed copyright claims at the pleading stage after comparing the works at issue and determining that there is no substantial similarity between them within the meaning of the Copyright Act.[2] While not every copyright infringement claim is appropriate for determination on

---

[2] *See e.g. Christianson v. West Pub. Co.*, 149 F.2d 202, 203 (9th Cir. 1945) (dismissal based on comparison of two maps); *Wild v. NBC Universal, Inc.*, 788 F.Supp.2d 1083 (C.D. Cal. 2011), *aff'd* 2013 WL 750655 (9th Cir. Feb. 23, 2013) (dismissal based on comparison of comic book and television series); *Zella*, 529 F. Supp. 2d at 1139 (dismissal based on comparison of plaintiffs' treatment for television show and defendants' television show); *Campbell v. Walt Disney Co.*, 718 F. Supp. 2d 1108 (N.D. Cal. 2010) (dismissal based on comparison of plaintiff's screenplay and

5

the pleadings, a motion to dismiss should be granted where, based on a comparison of the works, no reasonable jury could find substantial similarity.[3] *Zella*, 529 F. Supp. 2d at 1131 ("If after examining the works themselves, this Court determines that there is no substantial similarity, then the plaintiff here can prove no facts in support of his claim which would entitle him to relief – the standard for dismissal under Rule 12(b)(6)."). Discovery is unnecessary, as "discovery would not change the fact that the two works lack any concrete or articulable similarities." *Funky Films, Inc. v. Time Warner Entm't Co., L.P.,* 462 F.3d 1072, 1077 (9th Cir. 2006).

### B.  The Two Works Are Incorporated By Reference in the Complaint

In a copyright action, where, as here, the works that form the basis of the infringement claim are referenced in the complaint, the works are properly before the court under the doctrine of incorporation by reference. *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994) (in ruling on Rule 12(b)(6) motion, court properly considered contents of documents referenced in, but not attached to, amended complaint); *Knievel v. ESPN*, 393 F.3d 1068, 1076-77 (9th Cir. 2005) (court properly considered web pages in surrounding website under the "incorporation by reference" doctrine in ruling on motion to dismiss defamation claim). Such documents are not "outside the pleading," and thus may be considered at the Rule 12 stage without converting the motion into one for summary judgment. *Zella,* 529 F. Supp. 2d at 1131, n. 6, *citing Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1280 n. 16 (11th Cir. 1999); *Wild*, 788 F.Supp.2d at 1090 n.1. Thus, because the works are properly before the Court, and a comparison of Plaintiff's *Darci's* screenplay and Defendants' *WOS* shows that no reasonable juror

---

defendants' motion picture); *Capcom Co., Ltd. v. MKR Grp., Inc.*, 2008 WL 4661479, at *11 (N.D. Cal. Oct. 20, 2008) (dismissal based on comparison of plaintiffs' video game and defendant's motion picture); *Lake v. Columbia Broad. Sys.*, 140 F. Supp. 707, 708-09 (S.D. Cal. 1956) (dismissal based on comparison of plaintiff's book and a script of defendants' radio program).

[3]  Indeed, to allow such meritless claims to linger would not only be unfair to defendants, but would also undermine the Copyright Act's goal of promoting "society's . . . interest in the free flow of ideas, information and commerce." *Sony Corp. v. Universal City Studios, Inc.,* 464 U.S. 417, 429 (1984). Plaintiff has already exploited the asymmetry of information by preventing defendants from filing this motion for over seven months.

could find substantial similarity under the applicable authorities, Defendants' MJOP should be granted.

**C.**   **The Ninth Circuit's Extrinsic Test Requires the Court to Compare the Detailed Elements of the Works, After Filtering Out Unprotected Elements, Such as General Story Ideas and Scenes a Faire**

To state a claim for copyright infringement, a plaintiff must allege: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist*, 499 U.S. at 361. The second prong—the one at issue in this motion—requires that Plaintiff allege that "the infringer had access to [his] copyrighted work and that the works at issue are substantially similar in their protected elements." *Cavalier v. Random House, Inc.,* 297 F.3d 815, 822 (9th Cir. 2002). Even if access is present, the plaintiff cannot state a claim if substantial similarity is lacking. *Zella*, 529 F. Supp. 2d at 1133 (citing cases).[4]  The absence of substantial similarity requires dismissal.

To assess substantial similarity as a matter of law, the Court must compare the works at issue applying the Ninth Circuit's objective "extrinsic test." *Funky Films,* 462 F.3d at 1077.  This comparison "focuses on 'articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events' in the two works." *Id.* "In applying the extrinsic test, this court compares, not the basic plot ideas for stories, but the actual concrete elements that make up the total sequence of events and the relationships between the major characters." *Id.*  Critically, the Court "must

_____

[4]  For purposes of this Motion only, Defendants do not address access, other than to note that Plaintiff has not alleged any facts demonstrating that the vast majority of Defendants (and all of the directors, writers, and produces of *WOS*) were exposed to Plaintiff's work. Regardless, "[n]o amount of proof of access will suffice to show copying if there are no similarities." *Sid & Marty Krofft Television Prod., Inc. v. McDonald's Corp*., 562 F.2d 1157, 1172 (9th Cir. 1977); *see also, Funky Films,* 462 F.3d at 1081 (rejecting plaintiff's request for additional discovery because evidence of access would "not change the fact that the two works lack any concrete or articulable similarities"); *Cavalier*, 297 F.3d at 822-28 (even where defendants concede access, lack of substantial similarity defeats copyright infringement claim); *Kouf v. Walt Disney Pictures & Television*, 16 F.3d 1042, 1043-46 (9th Cir. 1994) (same).

take care to inquire only whether the protectable elements, standing alone, are substantially similar." *Id.* This requires the Court to "filter out and disregard the non-protectable elements in making its substantial similarity determination." *Id.* "Protectable expression includes the specific details of an author's rendering of ideas," not the ideas themselves. General plot lines and *scenes a faire* "are not protectable" under copyright law. *Id.* [5] After filtering out unprotectable elements, "[i]f the court determines that no reasonable jury could find that the works are substantially similar, or if it concludes that the similarities pertain only to unprotected elements of the work, it is appropriate for the court to dismiss the action because, as a matter of law, there is no copyright infringement." *Zella*, 529 F. Supp. 2d at 1131.

## IV.   *WOS* IS NOT SUBSTANTIALLY SIMILAR TO *DARCI'S* AS A MATTER OF LAW

In accordance with the Ninth Circuit's extrinsic test, the following discussion compares the "plot, themes, dialogue, mood, setting, pace, characters, and sequence of events" in *WOS* and *Darci's*, and demonstrates that the works lack substantial similarity of protected expression. *Funky Films*, 462 F.3d at 1077. The works share only the unprotectable general concept of a woman going on an adventure following a party.

### A.   Plot and Sequence of Events

Plaintiff alleges generic similarities— a farcical series of unrealistic events happen to a woman — that are merely general plot ideas, *scenes a faire* and/or unoriginal concepts that are not protected by copyright law. *Kennedy v. Paramount Pictures Corp.*, 12CV372–WQH–WMC, 2013 WL 1285109 (S.D.Cal. Mar.27, 2013) (granting a plaintiff's motion to dismiss because a copyrighted work was not substantially similar to defendant's depiction of characters, plot, and themes in *Titanic*.)

---

[5]  *Scenes a faire* are sequences of events that "flow naturally from generic plotlines." *Funky Films*, 462 F.3d at 1081; *Rice v. Fox Broad. Co.*, 330 F.3d 1170, 1177 (9th Cir. 2003) ("perform and reveal" sequence is unprotectable *scenes a faire* since there are "only a finite number of ways to reveal the secrets behind magic tricks"); *Williams v. Crichton*, 84 F.3d 581, 589 (2d Cir. 1996) ("electrified fences, automated tours, dinosaur nurseries, and uniformed workers . . . are classic *scenes-a-faire* that flow from the uncopyrightable concept of a dinosaur zoo").

There is no similarity, much less substantial similarity, between any expressive elements in the two works.[6]

1. *The Plot of WOS is Vastly Different from Darci's*

*WOS* begins with main character, Meghan Miles's professional life in flux. Meghan is distraught that she has missed out on becoming the next network news anchor for her news channel.  Meghan is a career woman; she defines herself by her status as a news-woman. The audience finds out early in the movie that her fiancé left her, but the real tragedy to Meghan (played by Elizabeth Banks) is not the loss of her fiancé (indeed, Meghan is barely perturbed by the loss of her one-time fiancé).  At this point of the film, Meghan believes that she can control her future.  The rest of the movie teaches Meghan that she is not in control and that to be truly happy she must learn to be content with being imperfect.  The theme of the movie is that Meghan's dream job is not as important as being content with the way the world really; good things can come from horrible, unwanted situations if one gives up the illusion of control.

With Meghan's life effectively in shambles, Meghan's two friends visit her Brentwood home to cheer her up.  They convince her to forget her troubles with a night on the town.  Meghan's two best friends are Rose (played by actress Jillian Jacobs) and Denise (as discussed below, there are no analogues for these two characters in *Darci*). After much protestation, Meghan relents to her friends' requests for a night out.  However, because Meghan is so boring, she doesn't possess any appropriate "club wear."  As a result, her friend Denise agrees to wear one of Meghan's conservative pantsuits, and gives Meghan her canary yellow Marc Jacobs dress and bright blue Betsy

---

[6] Copyright claims recently dismissed under 12(b)(6) or 12(c) in this District for lack of substantial similarity between the works include *Duckhole Inc. v. NBC Universal Media LLC,* No. CV 12-10077 (Sept. 6, 2013) (treatment and tv series); *Braddock v. Jolie*, CV 12- 05883 (March 29, 2013) (novel and film *In the Land of Milk and Honey*); *Wild v. NBC Universal*, 788 F.Supp.2d 1083 (C.D. Cal. 2011) (comic book and television series *Heroes*); *Segal v. Rogue Pictures*, 2:10-cv-05650 (C.D. Cal. Aug. 19, 2011) (screenplay and film *The Unborn*) *Musero, III v. Mosaic Media Group, Inc.*, 10-cv-1748 (C.D. Cal. August 9, 2010) (screenplay and *Bruno* movie); and *Scott v. Meyer*, 09-cv-6076 (C.D. Cal. November 24, 2009) (novel and *Twilight* saga novel).

Jacobs stiletto heels.  Unlike the frumpy, lace-ridden, bridesmaid's dress of *Darci*, Meghan's yellow cocktail dress is the epitome of modern fashion and sex appeal.

Even before the trio of women enter the club, *WOS* shows the audience that this is not Meghan's element.  At this point, it is clear Meghan is socially conservative.  Indeed, she prides herself on being in control.  Meghan is so conservative that she does not even swear.  In one of the rare instances where she accidently utters an expletive in front of her producer Dan (another character completely absent in *Darci)*, she quickly apologizes.  Similarly, from the very start, *WOS* demonstrates that Meghan is a faithful and unpromiscuous woman; she only has long term relationships, the latest of which was her fiancé.  Moreover, before being prodded into going to the club with her friends, Meghan insists on wearing sweat pants.  Similarly, when Meghan enters the club for the first time, she is so inexperienced that when presented with three shots of tequila, instead of giving one to each of her friends, she believes that they are all for her and downs them in quick succession.  This scene allows the movie to accomplish the necessary feats of getting Meghan inebriated (a component of the walk of shame) but also maintaining Meghan's innocence (because she only consumed the shots by accident).  The fact that Meghan is not familiar with the club scene, provides a necessary comedic backdrop.  If Meghan was a foul-mouthed lush (like the main character in *Darci's*), the upcoming string of unexpected adventures would have little comedic effect; if Meghan's character was not a "straight" character, the situations and circumstances that she is subjected to would make for a very dark and unfunny movie.

While Meghan tries to let loose at the club, Meghan's true nature quickly surfaces.  After downing several drinks and dancing for a few minutes, Meghan leaves the club through a fire escape.  On the fire escape, Meghan snags her shoe.  Meghan tries to free herself when her bartender (Gordon, played by James Marsden) sees Meghan's situation.  He frees Meghan's shoe, engages in some in some flirting, and attempts to send Meghan home.  Meghan responses with her first out-of-character moment, and suggests that the two go to the Gordon's apartment.  Once inside Gordon's apartment, a

montage of funny alcohol-fueled games and flirtations results in Meghan and Gordon sleeping together in his downtown loft.  It is tempting – but wrong – to think of Gordon as a romantic lead in a rom-com.  But, as explained further below, *WOS* is not about Meghan's ability (or lack thereof) to find a romantic partner; rather it is about her personal growth as an individual.  Whether or not Meghan ultimately has a further relationship with Gordon is inconsequential.  In fact, Meghan does not even see Gordon again until the final 10 minutes of the movie.  Rather, Gordon (together with Rose and Denise) provide minor characters for the secondary subplot – a subplot with no analogue in *Darci*.

     While in Gordon's apartment, Meghan learns from her producer, Dan, that she is, in fact, the frontrunner for the network news anchor job.  The only condition is that Meghan must return to her news studio and conduct one final news cast to the satisfaction of the network executives.  Of course, in this mad-cap comedy, fate conspires to keep her from her destination.  After a cat chases her out of Gordon's apartment without her cell phone, Meghan is left without her wallet or car as she realizes that her car has been towed.

Without a form of payment and without a cell phone Meghan stumbles upon an off duty cab driver.  The cab driver mistakes her for a sex worker (the first of several times that Meghan, still wearing her club dress, is mistaken for prostitute).  Contrary to the frumpy pink bridesmaid's dress of *Darci*, Meghan's yellow cocktail dress is so alluring that she is constantly mistaken for a prostitute throughout the movie.  Meghan is often unable to find help throughout her adventure because everyone from police officers to drug dealers think that she is a "woman of the night," which is only humorous because the audience knows that Meghan is nothing of the sort.  Fate tests Meghan's resolve by forcing her into situations that she would otherwise never face.

### a.    Friends Sub-Plot

While Meghan is desperately trying to return to her television studio in time for her news cast, both her friends and Gordon have their own sub-plot-driven adventure to

find Meghan.  Meghan's friends, Rose and Denise, meet up at Gordon's downtown loft. After threatening Gordon, Rose and Denise decide that Gordon is not an axe murderer and enlist his help to try to track Meghan down.  For the rest of the movie, the trio remains one-step behind Meghan, just missing out on rescuing Meghan from her misfortune.  They only reunite with Meghan in the last ten minutes once Meghan finds her car in the impound lot.

### b. **Meghan's Struggles Continue**

Meanwhile, although her friends have united, Meghan's misadventures continue unabated.  Under a bridge in downtown Los Angeles, Meghan finds no help in a group of prostitutes (who seem to the only people who recognize that Meghan is *not* a prostitute).  The police offer no help when they mistake Meghan for one of the prostitutes and issue her a warning for solicitation.

Meghan avoids the police and finds brief refuge with a trio of drug dealers (Scrilla, Pookie, and Hulk) – who also mistake her for a prostitute – in a "ghetto crack house" in East LA.  Here, the movie plays against type; the kind drug dealers recognize Meghan and offer to help her by providing a telephone, offer fashion advice about her Marc Jacobs dress, and offer sound advice about her television delivery style.  When a rival LA gang attacks the crack house, Meghan escapes to Russian portion of Western Ave.  She cannot ask for help for fear of internet notoriety.

Meghan finds her way to MacArthur Park and eventually on to an MTA bus. Once again, the bus driver and bus patrons mistake Meghan for a prostitute (old woman on the bus yells out "shame" upon seeing Meghan's provocative dress). At this point, Meghan begins to buck both her treatment at the hands of strangers and her own identity as a straight arrow.  She confronts the patrons and suggests that the bus in not simply for "good people."  Rather than helping the beleaguered Meghan, the bus driver maces Meghan until she fleas the bus. While the bus patrons completely misidentify Meghan, she is juxtaposed against a background of her face on billboards and news paper ads.

From here, Meghan runs afoul of a Jewish Chabad House on Wilshire and eventually a suburban teenager at the Olympic Public Library.  She continues her journey by tricking the teenager and stealing his bike.  By now, she acknowledges that sometimes good people have to do bad things to get their life back on track.  In keeping with that theme, Meghan then pretends to be a masseuse a Korea-town massage parlor to avoid the police.  Eventually she evades the police by running across the 10-freeway (which was temporarily traffic-free due to a carmaggedon-like event "Carpocalypse").

### c.   <u>Friends Reunite at the Tow Yard</u>

By now, Meghan has fully transformed from a meek "goody two shoes" to someone who knows what she wants and will do what it takes to get it.  After unsuccessfully trying to bribe the attendant at the tow lot (played by indie-comedy legend, Tig Notaro), Meghan utters her first expletive and tries to drive her car off the lot in defiance.  It seems that all is lost when the attendant deploys security spikes and pops Meghan's tires.  However, her friends then finally come to the rescue in the last 10 minutes of the film.

Finally reunited with Rose, Denise, and Gordon, Meghan is able to make it to the newsroom on time before her final newscast as a local anchor.  When the main story turns out to be about her misadventure, Meghan is unable to continue as expected.  Instead she rails against every person that assumed she was a prostitute because of the way she was dressed.  Yet, Meghan is not ashamed of her actions.  She explains that she will no long try to convince everyone that she is something she is not (a straight-laced, by-the-book anchor).  Instead she invites everyone to just be themselves.  For her candor, the network executives offer Meghan her own show as an investigative journalist.  She plays coy, opting instead to go on another adventure in LA.  The movie ends with Meghan walking across the 101-freeway bridge as the camera pans up on Hollywood.

\ \ \

\ \ \

MOTION FOR JUDGMENT ON THE PLEADINGS

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

   2. *Darci's Is a Completely Different Story*

  *Darci's* begins with an ugly bridesmaid's dress.  Unlike the knock-out yellow club dress that Elizabeth Banks wears in *WOS*, *Darci's* focuses on a horrific bridesmaid dress.  Specifically, the script describes Darci's dress as "a horribly ugly PUFFY PINK PASTRY ONE SHOULDER SOUTHERN BELLE STYLE BRIDESMAID DRESS." The dress is so bad the very first line of the script features a homeless woman sarcastically saying "nice dress."  Whereas in *WOS* the costumery causes Meghan to be constantly confused for a prostitute, in the main comedic device in *Darci's* is Darci's shame in wearing such a hideously ugly dress.

  The story continues with the main character, Darci Palter, picking up her boyfriend so that they can attend her sister's wedding in Hawaii.  Things quickly go awry when she walks in on her boyfriend (of less than three months) having sex with Darci's travel agent.  Darci, understandably upset, storms out of the apartment and back into her cab where she engages in the first of her many rants. Unlike Meghan Miles, Darci is crude, explicit, and shameless.  Darci's main problem is that she can never hold a boyfriend.  Indicative of this central problem, she rants to the cab driver:

DARCI

(choking up) I'm never gonna meet anyone. Every guy I've ever dated has left me for someone else. I'm too clingy. I'm too distant. I say I love you, too fast. I orgasm too slow. I'm not kinky enough. I'm a freak-- I'm too old- this from a 55 year old guy by the way. My ass is too small. My ass is too big- A black guy told me that. I mean what the fuck? My breasts are too big. My breasts are too small. One guy tells me I have child-bearing hips? What the fuck does that mean?

DRIVER

I think it means--

DARCI

I don't want to know what the fuck it means?!!
Darci starts banging the top of the taxi with her purse.

DRIVER

Jesus, lady!

Darci then continues her rant on the plane to Hawaii.  Unlike Meghan, who – as a straight arrow – was extremely inexperienced with drinking, Darci wastes no time in getting drunk on the plane.  As she downs champagne, she crudely explains her sexual encounters with her ex-boyfriends with fellow passengers including a "little girl" and then vomits all over the airplane bathroom.  The central conceit of *Darci's* is that lovelorn Darci must attend her sister's wedding on the ultra-romantic island of Maui without a date.  Darci is a serial monogamist; the audience is told that Darci can never keep a man longer than three months.  And as evidenced from Darci's first rant, she has no clue as to why men are uninterested in committed relationships with her.  In *WOS*, romance is a secondary or tertiary theme; in *Darci's* it is the sin qua non.

Immediately upon arriving on Maui, Darci meets Nathan a "36, rugged and shaggy dog handsome" jack-of-all-trades.  As the male romantic lead love interest, Nathan continually pops up throughout *Darci's* as fate conspires to bring Nathan and Darci together (unlike Gordon in *WOS* who spends the entire movie apart from Meghan).  Here, Nathan is playing a cab driver and picks up Darci.  He drives her to the Four Season's hotel where Darci and her family are staying.

At the Four Seasons, the audience is introduced to the balance of the supporting characters: Darci's family.  Darci's family includes Darci's mother and father, her sisters, her ancient great aunt, the groom, and the groom's family.  All of these characters share no analogue with the cast of *WOS* (see discussion of characters below).  These same characters all participate in the next several scenes, which consist of standard wedding-related activities: a rehearsal dinner luau, a spa day for the women, the sister's wedding ceremony, and a night-time wedding reception.

At the wedding reception (and for the rest of the script) Darci dons her bridesmaid dress "looking miserable, wearing her horrible pink puff pastry one shoulder overly ruffly southern belle dress – complete with tierra [sic]."  Darci can barely stand to be alone at the events and therefore decides to become blackout drunk (for the second

time is two days).  To combat her loneliness, Darci drunkenly makes out with a young waiter, Justin, and goes home with him.

Darci wakes up the next day -- presumably having slept with the college-aged Justin – in Justin's hotel room, which he shares with a number of young roommates. Justin offers his car to Darci so that she can return to her hotel room.  Darci leaves, forgets that she doesn't have the keys, and has a brief run-in with the woman at the front desk who is suspicious of Darci when she doesn't know her "boyfriend's" name or his room number.  After sneaking her way back in to Justin's hotel room and retrieving the keys, she finds that his car has been towed.

It is at this point that Darci's brief "walk of shame" begins before being rescued by the good-natured Nathan.  She walks her way to a golf course where a group of Japanese business men refuse to provide help.  While on the golf course, Darci steals a golf cart and engages is what is described as a surreal war-like scene with artillery-golf balls and simulated gunfire.  Darci drives the golf cart to the tow yard where she confronts the tow attendants.  The attendant explains that everyone is on Hawaiian time, so Darci can not retrieve Justin's car.  However, he offers to help and invites Darci to his local church.  Darci attends the church (receiving many stares at her ugly dress) but eventually leaves and walks down the highway.

It is by the side of the highway that Darci's "walk of shame ends" with a snake bite.  While briefly under the influence of the snake poison, she is quickly rescued by her dream-man Nathan.  He explains he is also a volunteer firefighter and sucks the snake poison out of Darci's foot.  Luckily, Nathan is also a volunteer helicopter pilot and he offers to fly Darci back to her hotel.  For the next ten pages, Darci and Nathan flirt while viewing the island of Maui from the air.  The flirtations end when Nathan must rescue Darci's parents from an active volcano.  Darci can't face the embarrassment of seeing her parents so she selfishly demands that Nathan drop her off in the forest before rescuing her parents.  Coincidentally, Darci runs into her ex-boyfriend who is on

MOTION FOR JUDGMENT ON THE PLEADINGS

horseback with Darci's travel agent.  After failing to secure a car, Darci hitches a ride on a native's outrigger back to the Four Season's hotel in time for the wedding brunch.

After a pep-talk from her 101 year-old aunt, Darci attends the brunch and explains where she has been.  Nathan, recognizes that Darci is embarrassed and attempts to create a fictional adventure, when Justin accidentally foils the attempt and explains that Darci slept over at his place the night before (but did not have sex with Darci).  Darci, mortified, leaves the brunch and take a cab to the airport.  After extended dialogue between Nathan and Darci, she still decides to leave Hawaii (and Nathan) and fly back to Chicago.  In a twist romantic ending, Nathan follows Darci to drizzling Chicago and agrees to leave Hawaii.  Presumably, Darci has finally captured her perfect man.  The script ends with Darci and Nathan kissing for the first time.  ("And they KISS- Finally- and it's a KISS worth waiting for. RAIN falls around them. A SHUTTLE BUS drives by SPLASHING AND SOAKING THEM.")

### 3.   *Plaintiff Points to No Protectable Expression*

The only potential commonality between the two works is that the main characters have difficulty walking home after a night of partying.  But a "walk of shame" is a common pop-culture reference and generic plot theme; it is unprotectable. In order to facilitate an extended walking journey, certain general ideas naturally flow: losing one's cellular phone, having a car towed, losing one's wallet.  The Ninth Circuit has repeatedly affirmed dismissals of copyright claims for failure to meet the extrinsic test, even where works share a number of similar ideas or plotlines—indeed, despite far greater similarities than those alleged here.  For example, in *Benay v. Warner Bros. Entm't*, 607 F.3d 620, 625 (9th Cir. 2010), the Ninth Circuit found no protectable similarities between the plaintiff's screenplay and the film "The Last Samurai" even though they "have identical titles; both share the historically unfounded premise of an American war veteran going to Japan to help the Imperial Army by training it in the methods of modern Western warfare for its fight against a samurai uprising; both have protagonists who are authors of non-fiction studies on war and who have flashbacks to

battles in America; . . . both feature the leader of the samurai rebellion as an important foil to the protagonist; [and] in both works the American protagonist is spiritually transformed by his experience in Japan."  See also, *Funky Films,* 462 F.3d at 1081 (HBO series *Six Feet Under*; no protection for similar plots involving "the family-run funeral home, the father's death, and the return of the 'prodigal son,' who assists his brother in maintaining the family business"); *Kouf,* 16 F.3d 1042 at 1044-45 (Disney movie *Honey, I Shrunk The Kids*; no protection for similar plots of shrunken kids and the "life struggle of kids fighting insurmountable dangers"); *Berkic,* 761 F.2d at 1293 (no protection for similar plots of "criminal organizations that murder healthy young people, then remove and sell their vital organs to wealthy people in need of organ transplants" and the general story of the "adventures of a young professional who courageously investigates and finally exposes, the criminal organization.").  Thus, in *Benay*, once the court had filtered out general plot ideas, it found more differences than similarities in the remaining protectable expression.  607 F.3d at 625; *see also, Milano v. NBC Universal, Inc.*, 584 F. Supp. 2d 1288 (C.D. Cal. 2008) (rejecting claim that television series "The Biggest Loser" infringed written treatment for a weight loss competition television series since allegedly similar story elements constituted *scenes a faire* and/or commonplace ideas that are not protectable under copyright law); *Walker v. Time Life Films,* 784 F.2d 44, 52 (2nd Cir. 1986) (copyright protection does not extend to "'stock' themes commonly linked to a particular genre," including "[f]oot chases and the morale problems of policemen, not to mention the familiar figure of the Irish cop, [which] are venerable and often recurring themes of police fiction"). The Court must be "particularly cautious where, as here, the [Plaintiff] emphasizes random similarities scattered throughout the works.  *Litchfield v. Spielberg*, 736 F.2d 1352, 1356 (9th Cir. 1984).  Here, filtering out any superficial similarities here, no protectable elements remain.

**B.**   **<u>Characters</u>**

1.   *The Main Characters Are Completely Different*

MOTION FOR JUDGMENT ON THE PLEADINGS

As is evident from the summaries of the two relevant plots, the main characters of the respective stories are very different. Meghan Miles of *WOS* is a career woman. She prides herself on being uncontroversial, trustworthy, and steadfast. She has never had any trouble landing long-term relationships with men, and does not appear to let her relationship with men define her. From the start of *WOS*, her main goal is the promotion to the network news anchor – her dream job. Over the course of the movie, she learns that it is more important to be happy with what one has than to have a successful career at the expense over everything else. Yet, even by the end, landing a man is simply an ancillary benefit and is not a defining characteristic for Meghan. *WOS* is primarily about contentment with imperfection, not romance.

*Darci's*, on the other hand, *is* primarily a romance. Where Meghan is defined by her desire to succeed at her job, Darci could not care less about her vocation (indeed, Darci does not speak about her vocation in the entire script). Darci's defining characteristic is her failure to land a quality man. She has never had a relationship longer than three months and cannot figure out why men leave her. Indeed, every boyfriend she has ever had has given her conflicting reasons for leaving. Darci then must face her worst fear (being alone) to attend her sister's wedding. After meeting, and then briefly being separated from the man of her dreams (Nathan) he quickly comes back to rescue her (literally and figuratively saving her life) and they spend the balance of the script flirting. Unlike Meghan, throughout the movie Darci is crass and vulgar, which allows the script to squeeze comedy from Darci's many sexual exploits and gaffes. Such vulgarity would contradict the comedic elements of *WOS*. Where one gets the sense that Meghan never drinks or lets loose, Darci gets drunk and becomes inappropriate twice in back-to-back scenes.

    2. *The Male Love Interests Are Both Very Different and Serve Different Purposes*

Plaintiff attempts to draw parallels between the two romantic lead characters. Such attempts are misplaced. Gordon in *WOS* is, at most, a secondary character. He

spends virtually the entire movie apart from Meghan. The little that is explained about Gordon shows he is very different from Nathan.  Gordon is a bartender and amateur writer and lives in a loft in downtown Los Angeles.  He does not have a car and does not appear to be successful in life.  The fact that he is a "nice guy" is nothing more than a general plot device (indeed, it would make no sense to make the love interest a "bad" guy in a light-hearted comedy).

*Darci's* Nathan is very different.  First and foremost, he is a rugged jack of all trades who drives a cab, volunteers for the fire department, and flies an emergency helicopter.  He moved to Hawaii after his wife passed away.  Nathan is Darci's dream man and provides the main goal for Darci; Darci's life will be complete when she can land a man like Nathan forever.  As a result, Darci and Nathan spend most of the script together.  The balance of the dialogue in *Darci's* is between Darci and Nathan as they get to know and learn to love each other.

### 3.   *The Remaining Bit Characters Share No Similarities*

Amongst the remaining characters in the two movies, there are no real similarities.

- There are no network executives in *Darci's*.  Plaintiff attempts to draw a parallel to the helicopter pilot "Chopper Steve" from *WOS* with Nathan, but this comparison falls flat; Chopper Steve – a traffic reporter – provides only comic relief whereas Nathan (the romantic lead) uses the helicopter to impress Darci.

- Meghan's two best friends, Rose and Denise, have no parallels in *Darci's*.

- The two police officers who chase Meghan throughout *WOS* have no parallels in *Darci's*.

- The kind drug dealers, the suburban teenager, the evil cab driver, and the jewish Chabad worshipers have no parallels in *Darci's*.

- Darci's family (including her sisters, parents, in-laws, and 101 year-old aunt Bertha) have no parallel in *WOS*.

MOTION FOR JUDGMENT ON THE PLEADINGS

- The Japanese golfers, the native Hawaiians, and Darci's dimwitted ex-boyfriend have no parallels in *WOS*.

To the extent that any top-level, general characteristics are shared, such similarities do not support a claim, because general character types are not protectable by copyright. See, e.g., *Hogan v. DC Comics*, 48 F. Supp. 2d 298, 310 (S.D.N.Y. 1999) (character types do not merit copyright protection); *Zella*, 529 F. Supp. 2d at 1134; *Cavalier*, 297 F.3d at 824 (character which naturally flow from a "basic plot idea" are "scenes-a-faire"); *Berkic*, 761 F.2d at 1293 (same).

"The almost complete lack of parallel characters strongly suggests, without any further analysis, that the works lack substantial similarity." *Wild,* 788 F. Supp. 2d at 1109 *citing Benay*, 607 F.3d at 626 and *Olson*, 855 F.2d at 1451–53.

## C.   <u>Setting</u>

*WOS* is set in the highly urban areas of Los Angeles and Hollywood, California. The entire movie is, in some ways, an homage to the city that is responsible for the television industry.  *WOS* starts at the KZLA news room in Hollywood.  Then, as Meghan takes in the aftermath of her fiancé leaving, the movie moves to her house in suburban Brentwood on LA's west side.  Her friends successfully convince her to go to a club downtown where she spends the majority of the movie, including such archetypal downtown-LA-settings as the financial district, the poorly lit train yards and bridges behind union station, and a self described "ghetto crackhouse."  From downtown, *WOS* follows Meghan on an adventure that takes her through the ethnic neighborhoods of Western Street, MacArthur Park, a Los Angeles Metro bus, a Jewish Chabad temple in Mid-town, the Suburbs, the Olympic Public Library, and a Korean massage parlor in Korean Town.  The climax of the film involves Meghan running across the famous – some would say infamous – 10-freeway just before an onslaught of cars are released after "Carpocalypse" (a clear reference to 2012's real event "Carmaggedon" in which the 405-freeway, which intersects the 10-freeway, was shut off for days).  Eventually, Meghan makes it across the 10-freeway to the "Mid-Wilshire" tow yard and then back

to her newsroom in Hollywood.  The film ends with Meghan walking over the 101-freeway bridge as the camera pans up to a wide shot of Hollywood itself, during a beautiful California sunset.

*Darci's* on the other hand, relies on the world-renown aspects of the remote jungle island of Maui.  A central theme of the setting is that Darci is looking for love, but is in exactly the wrong place.  According to Darci, Maui is solely for couples and newlyweds. Darci meets with locals, explores the tropical island, and forages through the lush jungle.  The screenplay closes with Darci and Nathan at the Chicago airport during a rain storm.  The scene explains that Nathan has decided to give up his island paradise to be with Darci, even if it means living in dreary Chicago.  Except for the very first, and very last scenes, *Darci's* takes place entirely in Hawaiian jungle, in stark contrast to the urban environment of Los Angeles and Hollywood.

The general idea of a character traveling through a given geography facing adversity is as old as the Homeric hero's journey and is not protectable.  *See e.g. Cavalier v. Random House, Inc.,* 297 F.3d 815, 824 (9th Cir. 2002) (while two works "share the general premise of a child, invited by a moon-type character, who takes a journey through the night sky and returns safely to bed to fall asleep . . . basic plot ideas, such as this one, are not protected by copyright law.").  Even if the various settings shared a likeness (which they do not), they would not support a finding of substantial similarity.

### D.   Mood

Plaintiff cannot demonstrate similarity of mood simply by alleging the fact that both works are comedies. A general mood which flows naturally from the basic premise of a program is *scenes a faire*, and cannot give rise to a copyright claim. See, e.g., *Rice,* 330 F.3d at 1177 (overall mood of secrecy and mystery arose from the basic plot idea of a show about revealing magic tricks, and therefore were unprotectable); *Olson v. Nat'l Broad., Co.,* 855 F.2d 1446, 1451 (9th Cir.1988) (a comic mood is standard to the

1  action-adventure television series genre, and therefore cannot give rise to a copyright

2  infringement claim).

3       The "mood" in *Darci's*, as far as can be determined, is very different from that in

4  *WOS*. In *Darci's*, the mood is romantic – not surprising because Darci's is, at heart, a

5  romance with comedic elements added on top. Further, the humor from Darci's comes

6  from crudeness and sexuality, which makes sense given that the protagonist's goal is to

7  find the man of her dreams. Because of that goal, *Darci's* can afford to have the main

8  character utter expletives like a sailor and engage in sexually explicit conduct. The

9  comedy in *WOS* on the other hand, depends on the main character being a conservative,

10  politically correct heroine. The jokes would not make sense if Meghan Miles was

11  cursing and explicitly sexual like Darci Palter. Moreover, there is little romantic tone in

12  *WOS*. In *WOS*, Meghan and Gordon spend the entire movie apart from each other. In

13  *WOS*, the point is to show that the protagonist has grown on a personal level and the

14  little romance that exists is simply a byproduct of Meghan's personal growth and is

15  inconsequential to her life. In *WOS*, Meghan sleeps with Gordon early in the first act

16  and then spends the rest of the movie apart. In *Darci's* on the other hand, Darci spends

17  nearly the entire movie with Nathan yet does not sleep or even kiss him until the very

18  last page of the script – page 107.

19       **E.**    **Dialogue**

20       There is virtually no overlap in dialogue. The events of the two stories (as

21  explained above) have very little in common and share no characters. As a result, the

22  dialogue is very different with no overlap.

23       Plaintiff's Complaint makes much of the fact that in both movies the same

24  adjective ("good") is used to describe both main characters (Meghan complains that she

25  is a "good girl" and Darci's mother suggests that she is a "good daughter.") But in

26  comedies that rely on bad things happening to good people, it should not be surprising

27  that both main characters are "good." In any case, such vague descriptors – used by

28  different characters in different contexts – does not create substantial similarity.

To establish a claim of substantial similarity based on dialogue, a plaintiff must establish the "extended similarity of dialogue." *Olson v. Nat'l Broad., Co*., 855 F.2d 1446, 1450 (9th Cir.1988). Ordinary words and phrases are not entitled to copyright protection, nor are "phrases or expressions conveying an idea typically expressed in a limited number of stereotyped fashions." *Narell v. Freeman*, 872 F.2d 907, 911–12 (9th Cir.1989). As with a similar case, Plaintiff "avoids dealing with the lack of any similarity in dialog by asserting, in cursory fashion," that other elements are similar. *Wild v. NBC Universal, Inc.*, 788 F. Supp. 2d at 1107 (C.D. Cal. 2011). The dialogue of *Darci's*, such as it is, shares no protectable elements with *WOS*.

## F.   <u>Pace</u>

It is difficult to compare the pacing of a fully-fledged movie and to Plaintiff's flat screenplay. Yet, one can surmise from the 107-page *Darci's* screenplay which features far more characters, scenes, and dialogue, that the pacing would be much faster, out of necessity and very different from *WOS*. Such factor cuts against a finding of substantial similarity.

\ \ \

\ \ \

\ \ \

\ \ \

\ \ \

\ \ \

\ \ \

\ \ \

\ \ \

\ \ \

\ \ \

\ \ \

\ \ \

MOTION FOR JUDGMENT ON THE PLEADINGS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## V.    <u>CONCLUSION</u>

In sum, aside from the unprotectable common idea of an adventure based comedy where a character has to walk home after getting drunk, *WOS* and *Darci's* share no substantial similarity of protectable expression.  Because the purported "similarities" alleged in the complaint either do not exist or are wholly generic and *scenes a faire*, Plaintiff cannot satisfy the extrinsic test and Plaintiff's copyright infringement claim fails as a matter of law.  Accordingly, the Court should grant Defendants' Motion to Dismiss in its entirety and dismiss Plaintiff's complaint without leave to amend.

Dated:  February 25, 2015                **BARNES & THORNBURG LLP**

By*:_____ /s/ Devin Stone_____*
STEPHEN R. MICK
DEVIN STONE
Attorneys for Defendants
Lakeshore Entertainment Group LLC *et al.*

LADS01 147097v3

MOTION FOR JUDGMENT ON THE PLEADINGS